**UNITED STATES of America,
Plaintiff–Appellant.**

v.

**Curtis J. BERNHARDT, Michael F. McCarthy, Harold T. Okahara, Jr., and Carl J. Bernhardt, Defendants–Appellees.**

**No. 85–1250.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 14, 1986.

Decided Feb. 25, 1988.

As Amended April 5 and April 8, 1988.

Daniel Bent, U.S. Atty., and Frank A. Wilson, Asst. U.S. Atty., Honolulu, Hawaii, John F. De Pue, Crim. Div., Washington, D.C., for plaintiff-appellant.

Benjamin B. Cassiday, III, Asst. Federal Public Defender, Honolulu, Hawaii, for defendant-appellee Carl J. Bernhardt.

Peter A. Donohoe, Honolulu, Hawaii, for defendant-appellee Curtis J. Bernhardt.

Dennis E.W. O'Connor and Charles E. McKay, Hoddick, Reinwald, O'Connor & Marrack, Honolulu, Hawaii, for defendant-appellee McCarthy.

Michael E. Weight, Honolulu, Hawaii, for defendant-appellee Okahara.

Before SNEED, ANDERSON and POOLE, Circuit Judges.

POOLE, Circuit Judge:

The United States appeals the district court's dismissal of twenty-nine counts of a seventy-four-count indictment. The subject counts charged defendants Curtis Bernhardt, Carl Bernhardt, Michael McCarthy, Harold Okahara (collectively appellees), and Daniel Matsukage with conspiracy to violate the mail fraud and wire fraud statutes of the United States, 18 U.S.C. §§ 371, 1341, 1343 and 2. Sixty-five separate acts of mail fraud (Counts 2 through 66) and eight acts of wire fraud (Counts 67 through 74) were set forth. Upon the motion of the defendants and following the recommendation of a United States Magistrate, the district court dismissed certain of the mail fraud counts, holding, on the authority of *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), that the mailings could not be held to have been made for the purpose of executing the alleged fraudulent scheme because they were normal business usages. We reverse and remand.

## FACTS AND PROCEEDINGS

Daniel Matsukage was president of both Pacific Standard Investment and Loan, Inc. (Pacific) and Real Estate Finance Corporation (REFC). Pacific is an industrial loan company authorized by Hawaii state law to solicit public funds for deposit and to make loans with these funds. REFC is a mortgage servicing company which has agreements with various mortgage companies to collect monthly mortgage payments from homeowners, deposit the payments into trustee accounts, and forward the balance of the monthly principal and interest to the mortgage companies after paying property taxes and other expenses incurred on the serviced property.

Appellees were officials of Norfolk Investment Co., Limited (Norfolk). Norfolk was established for the purpose of generating profits from investments in real estate and various other ventures.

By a superseding grand jury indictment, the government alleged that between December 1977 and December 1981, appellees and Matsukage operated these companies so as to carry out a broad scheme to defraud. Briefly, the scheme was said to have been as follows: Appellees and Matsukage organized and implemented depositor solicitation programs to attract depositors for Pacific. It was charged that they diverted funds from these programs into loans and disbursements to themselves as well as to REFC, Norfolk, and Norfolk's subsidiaries. To induce investments in Pacific, they artificially increased Pacific's capital stock, thereby receiving large deposits which they used to pay off loans owed Pacific, creating the appearance that Pacific had a more favorable cash position than actually existed. In addition, they caused security and collateral for loans made by Pacific to be released, subordinated, and substituted for their own benefit. It was further charged that appellees and Matsukage covered up these activities by causing false entries to be made and published by Pacific concerning its financial status.

To provide Pacific and Norfolk with additional cash, appellees and Matsukage were alleged to have diverted funds collected by REFC from homeowners pursuant to the mortgage servicing contracts. Instead of forwarding the proceeds to the mortgage companies or applying them to satisfy property tax bills, defendants would use the money as operating cash to improve Pacific's deficit cash position, or they would divert the funds to Norfolk to support its various business enterprises. To conceal their scheme with respect to REFC, they were alleged to have made or caused to be made false entries, records, representations and omissions of material facts.

Count 1 of the superseding indictment charged appellees and Matsukage with conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 371. Counts 2 through 30 charged separate acts of mail fraud, alleging that appellees and Matsukage caused the homeowners to mail their mortgage payments to REFC by sending the homeowners pre-addressed envelopes. Counts 31 through 65 alleged other mail fraud violations, while counts 66 through 74 alleged separate criminal acts of wire fraud.

Following a magistrate's recommendation and report, the district court dismissed counts 2 through 30 charging mail fraud. These counts were severed to allow this appeal by the government.

Meanwhile, McCarthy and Okahara proceeded to jury trial on the conspiracy count and on the mail fraud and wire fraud counts that had not been dismissed (Counts 1 and 31 through 74). At the conclusion of the government's case in chief, McCarthy and Okahara moved for a judgment of acquittal. The district court granted their motion as to all counts on the grounds of insufficiency of evidence. The government appealed the judgment of acquittal, but later moved to dismiss, recognizing that that appeal was barred by the Double Jeopardy Clause. By order of April 18, 1986 we granted the government's motion to dismiss that appeal.

In June 1986, the Bernhardts moved in district court to dismiss the counts surviving against them (other than those involved in this appeal). They claimed that since there had been a prior prosecution in Hawaii state court based largely upon the identical transactions set forth in the indictment and it had been dismissed by the state court because barred by the statute of limitations, further trial was barred by the Double Jeopardy Clause because the state and federal prosecutions were the same. They also claimed vindictive prosecution and collateral estoppel arising from the acquittal of Okahara and McCarthy. The district court denied motions to dismiss based on collateral estoppel and vindictive prosecution, but granted the motion for double jeopardy indicating that it believed the two prosecutions were in effect the same. The government appealed the judg-

ment granting dismissal on double jeopardy grounds. We reversed and remanded to permit the district court to make the factual determination essential to the applicability of *Bartkus v. Illinois*, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959). *United States v. Curtis J. Bernhardt, et al.*, 831 F.2d 181, 183 (9th Cir.1987). The Bernhardts' attempted appeals of the denials of their vindictive prosecution and collateral estoppel claims were dismissed as nonappealable prior to trial. *United States v. Curtis J. Bernhardt, et al.*, Nos. 86–1200 and 86–1201 (9th Cir. October 27, 1987) (unpublished) [831 F.2d 303 (table)].

This appeal involves the propriety and effect of the dismissal of Counts 2 through 30, and whether Curtis Bernhardt and Carl Bernhardt may yet be tried. Defendant Matsukage is deceased.

## DISCUSSION

### A. *Reviewability*

Pursuant to 28 U.S.C. § 636(b)(1)(B), the district court designated a magistrate to conduct hearings and to submit to the court proposed findings of fact and recommendations for defendants' motions to dismiss the above-numbered counts of the indictment.[1] Any party may serve and file written objections as provided by rules of court within 10 days of service of the magistrate's report and recommendations. The district court must make a *de novo* review of those portions to which objection is made. *Id.* The Rules of the United States District Court for the District of Hawaii mirror the statute and provide that the district court may consider the record developed before the magistrate and need not conduct a new hearing unless required by law. Local Rule 404–2 of the United States District Court for the District of Hawaii.[2] Appel-

---

1. Section 636(b)(1)(B) provides in part:
   a judge may * * * designate a magistrate to conduct hearings * * * and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion excepted in subparagraph (A) * * *.
   28 U.S.C. § 636(b)(1)(B) (1982).

2. Local Rule 404–2 provides that
   Any party may object to a magistrate's proposed order, findings, or recommendations

* * * within 10 days after being served with a copy thereof. Such party shall file * * * written objections which shall specifically identify the portions of the proposed order, findings, or recommendations to which objection is made and the basis for such objections. Any party may respond to another party's objections within 10 days after being served with a copy thereof. A United States District Judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objec-

lees argue that the the government's failure to file written objections to the magistrate's report and recommendation within the ten days set forth in the statute and the local rules, caused waiver of its right to appeal the district court's decision adopting that recommendation.

■ The failure to object to a magistrate's recommendation does not preclude appellate review under the statute. *Britt v. Simi Valley Unified School District,* 708 F.2d 452, 454 (9th Cir.1983). Furthermore, the local rule does not indicate that the failure to file objections in district court bars a subsequent appeal. Nevertheless, appellees ask this court to exercise its inherent supervisory powers and require a party seeking review of a magistrate's decision to file objections within ten days or waive the right to appeal. Although the Supreme Court has held that a court of appeals may exercise its supervisory powers to establish such a waiver rule, *Thomas v. Arn,* 474 U.S. 140, 142, 106 S.Ct. 466, 468, 88 L.Ed.2d 435 (1985), we have declined to adopt such a rule. *Britt,* 708 F.2d at 454. In *Britt,* we held that failure to file objections waives only factual issues on appeal. *Id.; accord McCall v. Andrus,* 628 F.2d 1185, 1187, 1189 (9th Cir.1980), *cert. denied,* 450 U.S. 996, 101 S.Ct. 1700, 68 L.Ed.2d 197 (1981). Because the issues in this case are purely legal, the government has not waived its right to challenge the magistrate's recommendation and the district court's order dismissing Counts 2 through 30.

### B. *Dismissal of Counts Two Through Thirty*

The dismissed mail fraud counts concern the mailings of mortgage and tax pay-

ments by homeowners to REFC in pre-addressed envelopes.[3] Appellees allegedly misappropriated this money for use by Pacific and Norfolk. Relying upon *Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), the magistrate recommended and the trial court ordered dismissal of these counts because the mailings were not made "in furtherance" of the scheme to defraud but were sent regularly and routinely as required by pre-existing servicing contracts with REFC, mortgagors and mortgage companies. The district court adopted the magistrate's report and dismissed counts 2 through 30.

■ An indictment is sufficient to withstand a motion to dismiss if it contains the elements of the charged offense in sufficient detail (1) to enable the defendant to prepare his defense; (2) to ensure him that he is being prosecuted on the basis of facts presented to the grand jury; (3) to enable him to plead double jeopardy; and (4) to inform the court of the alleged facts so that it can determine the sufficiency of the charge. *United States v. Jenkins,* 785 F.2d 1387, 1392 (9th Cir.), *cert. denied sub nom. Prock v. United States,* —— U.S. ——, 107 S.Ct. 192, 93 L.Ed.2d 125 (1986), *and sub nom. White v. United States,* —— U.S. ——, 107 S.Ct. 288, 93 L.Ed.2d 262 (1986). Whether an indictment is sufficient to withstand a motion to dismiss is a legal question which this court reviews *de novo. United States v. Buckley,* 689 F.2d 893, 897 (9th Cir.1982), *cert. denied,* 460 U.S. 1086, 103 S.Ct. 1778, 76 L.Ed.2d 349 (1983); *see United States v. McConney,* 728 F.2d 1195 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). In making our analysis, we pre-

---

tion is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The United States District Judge, however, will not conduct a new hearing unless required by law, and may consider the record developed before the magistrate, making his own determination on the basis of that record. The United States District Judge may in his discretion receive further evidence, recall witnesses or recommit the matter to the magistrate with instructions.
Local Rule 404–2 of the Rules of the United States District Court for the District of Hawaii.

**3.** Section 1341, the mail fraud statute, provides in pertinent part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, * * * for the purpose of executing such scheme or artifice or attempting so to do * * * knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing [whatever to be sent or delivered by the Postal Service], shall be fined not more than $1,000 or imprisoned not more than five years, or both.
18 U.S.C. § 1341 (1982).

sume that the allegations of the indictment are true. *Buckley*, 689 F.2d at 897.

To charge a violation of 18 U.S.C. § 1341 or § 1343, an indictment must allege facts demonstrating (1) the formation of a scheme to defraud, and (2) a knowing use of the mails in furtherance of the scheme. *United States v. Mitchell*, 744 F.2d 701, 703 (9th Cir.1984). Under the statutes, the mailings must be made or caused to be made "for the purpose of executing such scheme." *United States v. Maze*, 414 U.S. 395, 400, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974). Relying on *Parr*, appellees argue that the indictment could not be held to allege that the mailings by the homeowners or the transmissions by wire were made in furtherance of the scheme to defraud.

In *Parr*, the Supreme Court held that tax statements, checks in payment of taxes, and receipts of tax payments mailed or caused to be mailed by a local school board were not sent in furtherance of a scheme to defraud the school district of its revenue. The Court said:

> it cannot be said that mailings made or caused to be made *under the imperative command of duty imposed by state law* are criminal under the federal mail fraud statute, even though some of those who are so required to do the mailing for the District plan to steal, when or after received, some indefinite part of its moneys.

*Parr*, 363 U.S. at 391, 80 S.Ct. at 1183–84 (emphasis supplied.). Appellees argue that here, as in *Parr*, there was a pre-existing legal obligation to collect the mortgage and tax payments of the homeowners by virtue of REFC's contracts with the mortgage companies.

■ Appellees, however, endow *Parr* with too broad a scope. As noted by the Court, the factual situation in *Parr* was unique. *Id.* at 391, 80 S.Ct. at 1183. There, the Board was legally required by state law to assess, collect, and receipt taxes. This was, in fact, one of the Board's primary duties as a public corporation organized under state law. *See id.* at 374, 80 S.Ct. at 1174. Thus, it was the command of the state that compelled the mailings in that case independently of any contract. By contrast, the mailings at issue in this case were made to REFC pursuant to the inducement of private contracts initiated by

appellees. No preexisting legal obligation, federal, state, or local, required homeowners to transmit their monthly mortgage payments or property taxes through a mortgage servicing company such as REFC. Instead, the obligation to remit these payments to REFC arose from REFC's causation. The superseding indictment alleged that Matsukage, president of REFC and Pacific, and appellees, officials of Norfolk, actively engaged in a community of activities to foster the business interests of REFC. Consequently, appellees along with Matsukage controlled that company and used their positions to defraud the other parties to the mortgage servicing contracts.

Appellees contend that such a distinction is not controlling; that the Court's holding in *Parr* was founded on the premise that the mailings would legally have occurred in complete absence of the scheme to defraud. *See United States v. Tarnopol*, 561 F.2d 466, 472 (3d Cir.1977) ("We do not believe there is a valid distinction to be drawn between those routine mailings which are required by law and those routine mailings, themselves intrinsically innocent, which are regularly employed to carry out a necessary or convenient procedure of a legitimate business enterprise."). *But see United States v. Brown*, 540 F.2d 364, 377 (8th Cir.1976) (if the use of the mails is a business practice and not otherwise legally required, then the limited immunity defense recognized in *Parr* is inapplicable). Appellees argue that the homeowners' mailings in counts 2 through 30 would have occurred even if appellees had not devised and implemented the alleged scheme because of the pre-existing contracts between REFC and the mortgage companies. *See Mitchell, supra,* 744 F.2d at 704.

In *Mitchell,* the defendant, a member of the city council, had used his position to secure the council's approval of a condominium conversion project. In return for his support of the project, he received more than $100,000 from the project's owner. Mitchell had used the mails to defraud the city and his council colleagues by concealing the project owner's interest and Mitchell's hidden profit from the project's approval. Mitchell, citing *Parr,* raised the defense against a prosecution for violating 18 U.S.C. § 1341 that since the mailings concerning the condominium project were

independently required by law to be sent out before the project could be approved, they were not "in furtherance" of the scheme to defraud. We, however, distinguished *Parr* by noting that the mailings in *Parr* were sent out regularly and routinely and would have been mailed even if the scheme to defraud the District had not existed. In contrast, it was the defendant's fraudulent scheme that triggered the applicability of the local law that required the mailings in *Mitchell. Id.*

While our *Mitchell* decision held that *Parr* does not insulate from federal prosecution mailings whose necessity under law was triggered by the fraudulent scheme, it is not necessarily dispositive here. The issue here is whether mailings required by a *private agreement,* wherein one of the parties to the agreement is seeking to defraud the other, can be said to have been sent in furtherance of the underlying scheme to defraud. Neither *Parr* nor *Mitchell* dealt with such a circumstance.

As previously stated, the homeowners' duty to make the payments to REFC stemmed from contracts between REFC and various mortgage companies. The government alleged that appellees and Matsukage exercised control over REFC. As parties to these servicing contracts through their control of REFC, appellees retained the power to control REFC's legal obligations under the contracts and hence the payments by homeowners to REFC. Accordingly, the facts of this case depart from those of *Parr;* here, the requirement for the mailings stemmed from private convenience rather than from an independent and unrelated obligation, namely state law.

That appellees "caused" the mails to be used by the homeowners is beyond dispute. A person "causes" the mails to be used under § 1341 where he "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended * * *." *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954). Indeed, the Supreme Court's holding that mailings "in the ordinary course of business" are within the contemplation of section 1341 is clear support for the proposition that the exception created in *Parr* is narrow and that the general rule is that ordinary mailings are within the statute. Here, the homeowners were sent pre-addressed envelopes by which to remit their monthly payments. Obviously, appellees could not only foresee, but they also actually intended the homeowners to use the mails to remit such payments.

Because appellees caused the mailings in counts 2 through 30 for the purpose of executing the fraudulent scheme as alleged in the indictment, the district court erred in dismissing those counts under presumed compulsion of the decision in *United States v. Parr.*

## C. *Application of Collateral Estoppel*

■ As set forth above, at the conclusion of their jury trial, McCarthy and Okahara moved for judgments of acquittal on the conspiracy count and on the remaining undismissed mail and wire fraud counts. The district court granted the motion from the bench. Accordingly, under the Double Jeopardy Clause of the Fifth Amendment, McCarthy and Okahara cannot be retried on the counts of which they were acquitted. It is immaterial whether the acquittal was by jury verdict or by a direction of the court, either after the prosecution has completed its case or after all evidence is in. In any case, where there is an acquittal or direction to the jury to acquit, further trial on those charges is barred. *United States v. Scott,* 437 U.S. 82, 91, 98 S.Ct. 2187, 2193, 57 L.Ed.2d 65 (1978). The Bernhardts, however, argue that the acquittal of McCarthy and Okahara is a bar to putting them to further trial as to Counts 2 through 30. They urge us to apply nonmutual collateral estoppel against the government. We do not agree.

■ We note initially that the Double Jeopardy Clause does not bar the trial of any of the defendants as to Counts 2 through 30 "for the obvious reason that the subject counts * * * were dismissed prior to trial, and, therefore, the defendants have not yet been placed in jeopardy." *United States v. Schwartz,* 785 F.2d 673, 681 (9th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 290, 93 L.Ed.2d 264 (1986). As to all appellees, however, we must analyze whether

**1448**

their trial is barred by the collateral estoppel doctrine.

■ The Fifth Amendment guarantee against double jeopardy encompasses the doctrine of collateral estoppel. *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). This circuit employs a three-step process in analyzing a collateral estoppel claim. *Schwartz,* 785 F.2d at 681; *United States v. Hernandez,* 572 F.2d 218, 220 (9th Cir.1978). First, we identify the issues in the two actions to determine whether they are sufficiently similar and material to justify invoking the doctrine. Next, the record of the prior case must be examined to decide whether there was a full and fair opportunity to litigate the issue. Finally, we must decide, based on our examination of the record, whether the issue was necessarily decided in the prior case.

Applying the first factor, it is undeniable that the factual issues underlying count 1 and counts 31 through 66 are substantially similar to those posed by counts 2 through 30. The misappropriation of the mortgage payments mailed in by the homeowners was part of the overall scheme to defraud, as it was a source of cash to help fund the fraudulent activities of the defendants and the companies they controlled. We conclude that in the McCarthy and Okahara trial the government litigated the conspiracy charge, that part of Count 2 which set up the predicate scheme for Counts 31 through 39 (mailings by REFC to mortgage companies), Counts 45 through 48 (announcing REFC's intent to sell its mortgage servicing portfolio), and Counts 49 through 66 (mailing monthly balances). Those counts were structurally similar to the dismissed counts, albeit they argued different transactions and different times. The structure of the indictment was such that any of the counts, particularly the mail fraud counts, were bound up in a common nucleus related to the conspiracy and to the existence of the triggering scheme. Indeed, in order to present the mail fraud counts, the government had to advert to Counts 1 and 2, and in fact did so. Under these circumstances, we believe that the government had an opportunity fully to

litigate as against McCarthy and Okahara that portion of the scheme which involved the obtaining of misapplication of the mortgage funds collected by REFC.

The last factor—whether the common issue involved in counts 2 through 30 and the remaining counts was necessarily decided against the government—is not so clear. In order for collateral estoppel to apply an ultimate fact must have been determined previously by a valid and final judgment if relitigation of that issue between the same parties in a future lawsuit is to be foreclosed. *Ashe,* 397 U.S. at 443, 90 S.Ct. at 1194. The circumstances of this case are unlike those normally present when a defendant seeks to invoke collateral estoppel to preclude a subsequent prosecution. Generally, the doctrine of collateral estoppel is invoked after the factfinder has returned a verdict of not guilty in the prior prosecution. Here, the trial of McCarthy and Okahara ended before the case was submitted to the jury pursuant to Rule 29 of the Federal Rules of Criminal Procedure.

The district court's function in reviewing a defendant's motion for acquittal is quite narrow. The court, after viewing the evidence in the light most favorably to the government, must determine whether the jury could reasonably find the defendant guilty beyond a reasonable doubt. *United States v. Merriweather,* 777 F.2d 503, 507 (9th Cir.1985), *cert. denied,* 475 U.S. 1098, 106 S.Ct. 1497, 89 L.Ed.2d 898 (1986). The district court, however, must bear in mind that it is the jury's exclusive function to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts. *United States v. Dreitzler,* 577 F.2d 539, 545 (9th Cir.1978), *cert. denied,* 440 U.S. 921, 99 S.Ct. 1246, 59 L.Ed.2d 473 (1979).

Although in granting such a motion the district court is not sitting as the trier of fact, its finding of insufficient proof of a factual element of the crime apparently may be sufficient to trigger application of collateral estoppel. *See Sanabria v. United States,* 437 U.S. 54, 72–73, 98 S.Ct. 2170, 2183, 57 L.Ed.2d 43 (1978) (district court's acquittal for insufficient proof of an ele-

ment of the crime which was common to the second charge was treated as a "finding of fact" which stood as an absolute bar to further litigation of that element).

Addressing the conspiracy charge, the court concluded that the evidence was insufficient to show "any agreement or conspiracy to commit either mail fraud or wire fraud or fraud against the United States, nor * * * that the defendants, or either of them, had the intent to commit either mail fraud or wire fraud or fraud against the United States." With respect to the remaining counts, the court found that the evidence was insufficient "that the defendants, or either of them, were participants in any scheme or artifice to defraud, or any scheme or artifice to obtain money or property by false or fraudulent pretenses alleged in the superseding indictment." The court also found that no rational trier of fact would conclude beyond a reasonable doubt from all the evidence presented that the alleged uses of the mails were made for the purpose of executing any scheme or artifice to defraud.

These conclusions by the district court obviously are quite sweeping and highly generalized. In granting the motion, the court did not explain its reasoning or give any hint as to the weaknesses or deficiencies in the government's case. In fact, the record is devoid of any critical analysis whatsoever by the district court. Consequently, we are left to speculate about the reasons for the acquittal. Because we are mindful of the limitations upon the trial court's grant of a Rule 29 motion for a judgment of acquittal, we would hesitate to invoke collateral estoppel on such a shaky foundation.

The decision in *Ashe v. Swenson* has some pertinence here and Justice Stewart's treatment of that unique case is significant. In *Ashe,* three or four masked men broke into a house where six persons were engaged in playing poker. They robbed each player of money and property. They—whether three or four is uncertain—fled in the car of one of the victims. The car was found in a field and three men were arrested walking on a highway near the car. Ashe was arrested some distance away. All four were charged with robbery and theft of the car in a single indictment. Ashe went to trial alone charged with robbing victim Knight. The identity was weak and Ashe was acquitted. Six weeks later Ashe was brought to a second trial for the robbery of victim Roberts. Ashe moved to dismiss based on his prior acquittal. The motion was denied. The testimony of the witnesses was stronger on identity. The jury found Ashe guilty.

After exhausting appeal and remedy by habeas, Ashe petitioned for and the Supreme Court granted certiorari. Justice Stewart addressed the term "collateral estoppel" as follows:

"Collateral estoppel" is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. Although first developed in civil litigation, collateral estoppel has been an established rule of federal criminal law at least since this Court's decision more than 50 years ago in *United States v. Oppenheimer,* 242 U.S. 85 [37 S.Ct. 68, 61 L.Ed. 161 (1916)]. As Mr. Justice Holmes put the matter in that case, "It cannot be that the safeguards of the person, so often and so rightly mentioned with solemn reverence, are less than those that protect from a liability in debt." 242 U.S. at 87 [37 S.Ct. at 69]. As a rule of federal law, therefore, "[i]t is much too late to suggest that this principle is not fully applicable to a former judgment in a criminal case, either because of lack of 'mutuality' or because the judgment may reflect only a belief that the Government had not met the higher burden of proof exacted in such cases for the Government's evidence as a whole although not necessarily as to every link in the chain." *United States v. Kramer,* 289 F.2d 909, 913 [(2d Cir. 1961)].

*Ashe* 397 U.S. at 443, 90 S.Ct. at 1194 (internal footnote omitted).

The nub of the decision in Ashe's favor was this: "The single rationally conceiva-

ble issue in dispute before the jury was whether the petitioner had been one of the robbers. The jury by its verdict said that he had not. The Federal Rules of Law, therefore, would make a second prosecution for the robbery of Roberts wholly impermissible." *Ashe* at 445, 90 S.Ct. at 1195.

The above rationale does not fit neatly the situation involving McCarthy and Okahara. That the government failed to prove that they conspired (count 1) or that they hatched the scheme charged against them in counts other than 2 through 30, does not imply, by analogy to *Ashe*, that it was therefore not "rationally conceivable" that they committed the offenses in the discrete counts of 2 through 30. The government may or may not succeed in convincing the court or jury of their guilt at a trial. What we determine here is that the verdict which Judge Craig directed in their favor as to the other charges does not collaterally estop further trial on the issues which were not encompassed in that verdict.

■ Turning now to whether the Bernhardts, who have not gone to trial on any counts, are protected against trial because of the acquittal of McCarthy and Okahara, we are of the opinion that such trial is in no way barred. Judge Craig did not have before him the severed counts (2 through 30) when he made his ruling. The finding that the evidence against McCarthy and Okahara was insufficient for a rational jury to have found that *they* were involved in conspiracy, scheme to defraud, with the requisite intent, does not render it "rationally [in]conceivable" that the Bernhardts could have been so involved. Indeed, the Bernhardts' situation is more like that in *Standefer v. United States*, 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980) than that in *Ashe.*

Standefer, a corporate official, was indicted for his part in paying for the vacations of Niederberger, an official of the Internal Revenue Service. The indictment contained nine counts, four of which alleged illegal gifts to Niederberger in violation of 18 U.S.C. § 201(f) and five of which charged abiding and abetting the official in

receiving unauthorized compensation, in violation of 18 U.S.C. § 2, which took the form of paying for five vacation trips by Niederberger to Pompano Beach, Miami, Absecon, Pebble Beach and Las Vegas.

Niederberger was himself separately charged in a ten-count indictment with five counts of violating 18 U.S.C. § 201(g), and five counts of violating 26 U.S.C. 7214(a)(2), which forbid the acceptance of unauthorized compensation. Niederberger was convicted after trial of four counts under 18 U.S.C. § 201(g) (vacations in Miami, Absecon, Pebble Beach, and Las Vegas). He was acquitted on one § 201(g) count (Pompano Beach, apparently because the statute of limitations had run), and on three § 7214(a)(2) counts (Pompano Beach, Miami, and Absecon).

After Niederberger's trial, but before start of his own, Standefer moved to dismiss the counts which charged him with aiding and abetting Niederberger in connection with the Pompano Beach, Miami and Absecon vacations, arguing that since the sole principal had been acquitted of accepting unlawful compensation as to those trips, he could not be convicted of aiding and abetting the commission of those offenses. The district court denied the motion. Standefer admitted authorizing payments for all five trips, but claimed they were on a personal basis and not designed to influence Niederberger. The jury convicted him of all nine counts. The Court of Appeals affirmed the conviction. The Supreme Court granted certiorari because it involved an issue "of importance to the administration of criminal justice on which the Courts of Appeals are in conflict." 447 U.S. at 14, 100 S.Ct. at 2003.

In the Supreme Court, Standefer had two arguments. The first was that one charged as an aider and abettor could not be prosecuted after the principal has been acquitted of the offense charged. The second was that the government was at least barred from relitigating the issue whether Niederberger had accepted unlawful compensation in connection with the Pompano Beach, Miami, and Absecon vacations because of the doctrine of nonmutual collateral estoppel. Chief Justice Burger, writ-

ing for a unanimous court, rejected both contentions. It is with the second argument that we are primarily concerned.

The opinion first notes:

The doctrine of nonmutual collateral estoppel was known to the common law and to the Congress when it enacted § 2 in 1909. It emerged in a civil case in 1942, *Bernhard v. Bank of America Nat. Trust & Savings Assn.,* 19 Cal.2d 807, 122 P.2d 892 [(1942)]. This Court first applied the doctrine in *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313 [91 S.Ct. 1434, 28 L.Ed.2d 788] (1971). There, we held that a determination of patent invalidity in a prior infringement action was entitled to preclusive effect against the patentee in subsequent litigation against a different defendant. Just this past Term we again applied the doctrine—this time "offensively"—to hold that a defendant who had had a "full and fair" opportunity to litigate issues of fact in a civil proceeding initiated by the Securities and Exchange Commission could be estopped from relitigating those issues in a subsequent action brought by a private plaintiff. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322 [99 S.Ct. 645, 58 L.Ed.2d 552] (1979). In both cases, application of nonmutual estoppel promoted judicial economy and conserved private resources without unfairness to the litigant against whom estoppel was invoked.

Here, petitioner urges us to apply nonmutual estoppel against the Government; specifically he argues that the Government should be barred from relitigating Niederberger's guilt under § 7214(a)(2) in connection with the vacation trips to Pompano Beach, Miami, and Absecon. That issue, he notes was an element of his offense which was determined adversely to the Government at Niederberger's trial.

This, however, is a criminal case, presenting considerations different from those in *Blonder-Tongue* or *Parklane Hosiery.* First, in a criminal case, the Government is often without the kind of "full and fair opportunity to litigate" that is a prerequisite of estoppel. Sever-

al aspects of our criminal law make this so: the prosecution's discovery rights in criminal cases are limited, both by rules of court and constitutional privileges; it is prohibited from being granted a directed verdict or from obtaining a judgment notwithstanding the verdict no matter how clear the evidence in support of guilt, cf. Fed.Rule Civ.Proc. 50; it cannot secure a new trial on the ground that an acquittal was plainly contrary to the weight of the evidence, cf. Fed.Rule Civ. Proc. 59; and it cannot secure appellate review where a defendant has been acquitted. See *United States v. Ball,* 163 U.S. 662, 671 [16 S.Ct. 1192, 1195, 41 L.Ed. 300] (1896).

The absence of these remedial procedures in criminal cases permits juries to acquit out of compassion or compromise or because of " 'their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.' " * * * It is of course true that verdicts induced by passion and prejudice are not unknown in civil suits. But in civil cases, post-trial motions and appellate review provide an aggrieved litigant a remedy; in a criminal case the Government has no similar avenue to correct errors. Under contemporary principles of collateral estoppel, this factor strongly militates against giving an acquittal preclusive effect. [Citation omitted.]

The application of nonmutual estoppel in criminal cases is also complicated by the existence of rules of evidence and exclusion unique to our criminal law. It is frequently true in criminal cases that evidence inadmissible against one defendant is admissible against another. The exclusionary rule, for example, may bar the Government from introducing evidence against one defendant because that evidence was obtained in violation of his constitutional rights. And the suppression of that evidence may result in an acquittal. The same evidence, however, may be admissible against other parties to the crime "whose rights were [not] violated." *Alderman v. United States,* 394 U.S. 165, 171–72 [89 S.Ct. 961, 965, 22 L.Ed.2d 176] (1969). Accord, *Rakas v. Illinois,* 439 U.S. 128, 134 [99

S.Ct. 421, 425, 58 L.Ed.2d 387] (1978). In such circumstances, where evidentiary rules prevent the Government from presenting all its proof in the first case, application of nonmutual estoppel would be plainly unwarranted.

447 U.S. at 21–24, 100 S.Ct. at 2006–08. The Court concluded with the following statement:

> In denying preclusive effect to Nieder-berger's acquittal, we do not deviate from the sound teaching that "justice must satisfy the appearance of justice." *Offutt v. United States,* 348 U.S. 11, 14 [75 S.Ct. 11, 13, 99 L.Ed. 11] (1954). This case does no more than manifest the simple, if discomforting reality that "different juries may reach different results under any criminal statute. That is one of the consequences we accept under our jury system." *Roth v. United States,* 354 U.S. 476, 492, n. 30 [77 S.Ct. 1304, 1313, n. 30, 1 L.Ed.2d 1498] (1957). While symmetry of results may be intellectually satisfying, it is not required. See *Hamling v. United States,* 418 U.S. 87, 101 [94 S.Ct. 2887, 2899, 41 L.Ed.2d 590] (1974).

*Id.* at 25, 100 S.Ct. at 2008–09.

The reasoning of Chief Justice Burger in *Standefer* demonstrates compellingly why the mere fact that a co-defendant has been acquitted or convicted is not to be the determinant whether other persons not acquitted, indeed not even tried, may be subject to prosecution. But in this case, there is more: the findings of the trial judge in the cases of McCarthy and Okahara never purported to hold that there was no scheme as to counts 2 through 30, or that there were no mailings with fraudulent intent as to those counts. The government has never had a "full and fair" opportunity to litigate the issues of those counts as to any of the defendants. Thus, there is no obstacle to completion of this case.

## CONCLUSION

Neither the decision of the Supreme Court in *Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), nor the collateral estoppel doctrine constitutes a bar to the trial of appellees Curtis J. Bernhardt, Carl J. Bernhardt, Michael F. McCarthy and Harold T. Okahara on the dismissed mail fraud counts, numbers two through 30. Accordingly, the judgment dismissing counts two through 30 of the superseding indictment is REVERSED as to all the above appellees and the case is REMANDED for further proceedings consistent with this opinion.

### REVERSED AND REMANDED.