**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Michael Valentine ROSI, aka Michael Valentine Edwards, aka Michael Valentine, aka Michael Edwards, aka Michael Valentine Rose, Defendant–Appellant.**

No. CA–93–10034.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 5, 1993.

Decided June 20, 1994.

Jon M. Sands, Asst. Federal Public Defender, Phoenix, AZ, for defendant-appellant.

W. Allen Stooks, Asst. U.S. Atty., Phoenix, AZ, for plaintiff-appellee.

Before: CANBY and NOONAN, Circuit Judges, and ORRICK,* Senior District Judge.

Opinion by Judge Orrick.

ORRICK, District Judge:

Defendant, Michael Valentine Rosi, was found guilty by a jury of transporting stolen property interstate in violation of 18 U.S.C. § 2314. He appeals claiming the district court erred in denying (1) his motion to suppress evidence obtained in a warrantless entry and search allegedly in violation of his Fourth Amendment rights, and (2) his motion to dismiss the indictment because it failed to identify the states between which the evidence was transported. We affirm.

## I.

This case involves the theft and interstate transportation of $249,000 stolen from Mr. Joseph Onofrio. Onofrio kept the money in a safe in his garage. On January 22, 1992, an "electrical repairman," later identified as Rosi, appeared at Onofrio's house, and after some conversation with Onofrio, suggested that Onofrio go in the house to disconnect household appliances. Onofrio did so and when he returned to the garage, he found

---

* Honorable William H. Orrick, Senior United States District Judge for the Northern District of California, sitting by designation.

that the safe was missing and the "repair-man" gone.

FBI agents arrested Rosi on March 25, 1992, at a ski resort near Denver, Colorado. At the time of his arrest Rosi was with Susan Barber, in whose name the condominium where they were staying had been rented. Following his arrest, Rosi asked the FBI agents if he could change out of his ski gear and put on jeans. The agents acquiesced, and Rosi, who was handcuffed, provided the agents with a key to open the condo. The agents and Rosi then entered the condo, and Rosi changed his clothes.

One agent took Barber to an FBI vehicle for questioning and then escorted her to the condo. Barber did not object to entering the condo with the agent. Agent Knight asked Barber if Rosi had any possessions or money stored in the condo, and Barber responded that she didn't think so, and then added "[g]o ahead and look around." [E.R. at 20–21]. Accompanied by a female agent, Barber went into the bedroom she shared with Rosi to change her clothes. Barber told the agent that Rosi had told her that one of the two lamps in the room was more expensive than the other. When the agent reported this comment to Agent Knight, he went to the room and examined the two lamps, discovering that one weighed considerably more than the other. He turned over the heavier lamp, saw that the felt lining had been tampered with, pulled it back and found approximately $70,000 in cash. Barber was in the room while these events transpired and made no objections to Knight's actions.

The indictment charging Rosi with interstate transportation of stolen property was "bare-bones," alleging that Rosi "did transport in interstate commerce money of value in excess of $5,000, knowing said money to have been stolen." The indictment did not identify the states between which the evidence was transported.

II.

■ We first review the validity of the warrantless entry and warrantless search under the clearly erroneous standard because the voluntariness of a consent to search is a question of fact. *See United States v. Castillo,* 866 F.2d 1071 (9th Cir.1988); *United States v. Licata,* 761 F.2d 537 (9th Cir.1985).[1]

■ Preliminarily we, of course, recognize the deep-rooted principles governing the application of the Fourth Amendment to the facts concerning the warrantless entry and warrantless search in the case at bar. Compliance with the strictures of the Fourth Amendment in most cases can only be accomplished by obtaining search warrants before entering and searching. *United States v. Ventresca,* 380 U.S. 102, 106, 85 S.Ct. 741, 744, 13 L.Ed.2d 684 (1965). Although warrantless searches are not absolutely precluded, the exceptions to the requirement for a warrant must be "jealously and carefully drawn." *Jones v. United States,* 357 U.S. 493, 499, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958).

■ Here, notwithstanding the fact that the government's agents never requested or obtained written or verbal consent to enter

---

1. Rosi contends that an appellate court reviewing whether or not an individual impliedly consented to a search of a premises should employ a *de novo* standard citing *United States v. Shaibu,* 920 F.2d 1423 (9th Cir.1990) and *United States v. Mejia,* 953 F.2d 461 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1983, 118 L.Ed.2d 581 (1992).

    In both *Mejia* and *Shaibu,* however, this Court qualified its decision that the *de novo* standard of review was applicable on the basis that both cases involved conduct that called for the formulation of a general rule that would be applicable to a wide class of cases. *See Shaibu,* 920 F.2d at 1425 (whether retreat into home constituted implied consent for officers to enter); *Mejia,* 953 F.2d at 465–467 (whether an individual's allow-

ing police to follow her from one room to another without objections constituted implied consent). The *Mejia* court cited *United States v. Thomas,* 863 F.2d 622, 625 (9th Cir.1988), where the court stated that "[while] mixed questions of law and fact [that are normally presented by motions to suppress] usually require *de novo* review, ... the clearly erroneous standard applies if the necessary analysis is predominantly factual in nature." *Id.* at 625. The instant case involves an unusual set of factual circumstances that required the district court to weigh and evaluate various live testimony given at the suppression hearing. The clearly erroneous standard is the appropriate standard in such a situation.

and search, the government's position is that this case is one of implied consent. The government "always bears the burden of proof to establish the existence of effective consent." *United States v. Impink*, 728 F.2d 1228, 1232 (9th Cir.1984). "That burden is heaviest when consent would be inferred to enter and search a home...." *Shaibu*, 920 F.2d at 1426. Under certain narrow circumstances, however, "courts will infer consent from the cooperative attitude of a defendant." *Impink*, 728 F.2d at 1232. The district court found that Rosi had allowed FBI agents into the condo so that he could change his clothes as he had requested and that Barber had "invited" the agents to search the lamp where the money was recovered. As a result, it found no Fourth Amendment violation, nor do we.

Rosi, however, argues that this Court's decision in *Shaibu*, 920 F.2d 1423, dictates a finding that the agents violated his Fourth Amendment rights by their warrantless entry and warrantless search of his condo. In *Shaibu*, police officers appeared at what they thought was a suspect's home and followed the owner into his home as he retreated without obtaining his express or even implied consent. The district court found that Shaibu's failure to object created an implicit invitation to enter and search the apartment. *Id.* at 1424. In *Shaibu* we disagreed, noting that "in the absence of a specific request by police for permission to enter a home, a defendant's failure to object to such entry is not sufficient to establish free and voluntary consent. We will not infer both the request and the consent." *Id.* at 1428.

This case differs from *Shaibu*. Here Rosi had already been lawfully arrested outside his condo and was in police custody. Rosi does not contend that his arrest was unlawful. Also, Rosi affirmatively requested the

arresting agents for permission to change his clothes and provided the agents with a key to the condo in order to do so.

In a similar situation, we held that such a request necessarily implies consent for police to enter the home. In *United States v. Gilbert*, 774 F.2d 962 (9th Cir.1985), the defendant was arrested wearing only shorts and a tee shirt. She asked one of the arresting officers to go to her home and get some clothing for her that she said could be found on her bed. When the defendant attempted to suppress evidence that the officer had found in plain view in the bedroom, this Court held that "[defendant's] request that the officers obtain her clothing necessarily implied consent to enter the bedroom in which she said the clothing was located." *Id.* at 964.

Similarly, here, Rosi's affirmative request to change out of his ski gear before leaving for the police station and his provision of a key to the agents to open the condo, necessarily evinced his consent to have the agents enter the premises with him. Indeed, in *Shaibu* we specifically distinguished *Gilbert* noting parenthetically that the court held that the facts supported a finding of implied consent. *Id.* 920 F.2d at 1426. Based on the facts presented to it at the suppression hearing and our holding in *Gilbert*, the district court's finding that Rosi impliedly consented to the agents' warrantless entry into the condo was not clearly erroneous.

▬▬ Rosi also argues that the agents violated his Fourth Amendment rights when they entered the condo with Barber.[2] At the suppression hearing, Agent Knight testified that it was Barber's suggestion that they proceed to the condo. Barber testified that she recalled that it was the agents who had suggested that they go inside and that in

---

**2.** In the alternative, Rosi argues that even if Barber consented to the agents' entry and subsequent search, she lacked authority to do so. This Circuit looks at three factors to determine whether a third party's consent is effective: (1) whether the third person has an equal right to access the premises searched; (2) whether the defendant was present at the time the third party consented; and (3) if so, whether the defendant actively opposed the search. *U.S. v. Warner*, 843 F.2d 401, 403 (9th Cir.1988); *U.S. v. Impink*, 728

F.2d 1228, 1233 (9th Cir.1984). Here, the condo was rented in Barber's name and Barber shared the entire premises with Rosi during their ski vacation. In addition, the record shows that Rosi had already left the condo with agents at the time the lamp was searched and he did not actively oppose the search. For these reasons, Barber's consent to search was effective. Rosi's reliance on *Warner* and *Impink*, both involving the consent of a landlord to search a tenant's apartment, is misplaced.

response, she got out of the FBI car and went with them without objection. Either way, her own testimony indicates that through her affirmative acts of cooperation she impliedly consented to their request to enter the condo.

■ Rosi next argues that the agents' warrantless search of the lamp was also in violation of the Fourth Amendment. A review of the facts pertaining to the search of the lamp is helpful. While in the condominium, Barber went into a room that she shared with Rosi to change her clothes. A female agent accompanied her. Barber told the agent that Rosi had told her that one of the lamps in the room was more expensive than the other. At the suppression hearing, she testified:

Q: Were you cooperating with the agents at this time?

A: Yes.

Q: Had you always cooperated?

A: Yes.

     \*     \*     \*     \*     \*     \*

Q: (by the court): ... What did you expect would happen after you said that one was more expensive than the other?

A: That the money was in the lamp. I knew that.

Q (by the court): Did you know the money was there?

A: That's why I told them, I said, one lamp is more expensive than the other.

Q: What did you expect the agents to do when you told them that, Ms. Barber?

A: To find the money.

[E.R. at 59–61]

The government argues that *United States v. Mejia,* 953 F.2d 461 (9th Cir.1991), controls this case. In *Mejia,* police officers arrived at the defendant's house without a warrant and asked his wife if they could enter. When the officers then asked if there was anyone else at home, she said her husband was and proceeded to the bedroom. She did not protest when they followed her into the room. The officers identified themselves and ultimately convinced Mejia to sign a consent to search form. *Id.* at 463.

Mejia subsequently moved to suppress the items found in his home on the basis that the scope of his wife's consent to enter the home "did not permit the officers to enter his bedroom." *Id.* at 466. This Court disagreed noting:

> Mejia correctly asserts that consent to enter one's threshold for the limited purpose of talking about an investigation does not include permission to enter a bedroom occupied by a sleeping spouse.... However, once the officers were in the house, Cajigas [his wife] gave a subsequent implied consent to let them enter the bedroom by not objecting when the officers followed her into the bedroom. Presumably a reasonable person who objected to the officers' following her would have said so. The officers could reasonably interpret Cajigas's behavior to mean that she was leading them to her husband in response to their request.

*Id.* at 466.

While *Mejia* is certainly instructive, the government is incorrect that it controls the outcome in the instant matter. As the defendant points out, this court in *Mejia* was careful to distinguish its case from *Shaibu,* noting that *Shaibu* "involved the issue of implied consent to enter a dwelling ... after express consent to enter the dwelling had been given." *Id.* at 466. Similarly, Rosi is incorrect that in cases involving consent to enter a dwelling, *Shaibu's* requirement of express consent applies.

This case involves several factual dynamics distinct from those presented in *Shaibu* and *Mejia.* First, the defendant was lawfully arrested outside his home, was granted his express request to go inside and change his clothes, and provided a key to his condo to agents so that they could gain entry.

Second, this case also involves an individual (Barber) who was fully cooperating with authorities, who had joint access to the condominium, who invited agents to "go ahead and look around," and who volunteered to an agent that pertinent evidence might be found in a lamp. Her testimony clearly indicates that she was willingly cooperating with authorities, that she offered the information about the lamp with the full expectation that

the agents would search it, and that she did not object when they proceeded to do so. Under these circumstances, the district court was not clearly erroneous in finding that Barber "invited" the agents to look in the lamp and, consequently, the defendant's Fourth Amendment rights were not violated.

## III.

We now review *de novo* Rosi's attack on the validity of the indictment. *United States v. Bernhardt*, 840 F.2d 1441, 1445 (9th Cir. 1988), *cert. denied*, 488 U.S. 954, 109 S.Ct. 389, 102 L.Ed.2d 379 (1988); *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir.1991).

■ In the indictment the grand jury charges "[t]hat on or about January 22, 1992, in the District of Arizona, Michael Valentine Rosi, aka Michael Valentine Edwards, Michael Valentine, Michael Edwards, did transport in interstate or foreign commerce money of a value in excess of $5,000, knowing said money to have been stolen. In violation of Title 18, United States Code, Section 2314 . . . ." [E.R. at 1]

The essential elements of an offense under Section 2314 are (1) transportation of stolen property with a value of at least $5,000 through interstate commerce (2) with fraudulent intent. *United States v. Johnson*, 805 F.2d 753, 758 (7th Cir.1986) (citations omitted).[3]

■ An indictment will withstand a motion to dismiss "if it contains the elements of the charged offense in sufficient detail (1) to enable the defendant to prepare his defense; (2) to ensure him that he is being prosecuted on the basis of the facts presented to the grand jury; (3) to enable him to plead double

jeopardy; and (4) to inform the court of the alleged facts so that it can determine the sufficiency of the charge." *Bernhardt*, 840 F.2d at 1445 (citations omitted). The Supreme Court has held that it is acceptable for an indictment to set forth the offense in the language of the statute itself provided that the language clearly sets forth all the requisite elements of the offense without ambiguity. *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974) (citations omitted).

The district court denied Rosi's pretrial motion to dismiss the indictment. It did, however, direct "the Government [to] file and serve [a] notice upon the defendant, reciting the state from which and the state to which the Government contends the property, allegedly stolen, was taken." [E.R. at 9] The government complied, filing a bill of particulars in which it listed the states of Arizona and California. It is well settled, however, that a bill of particulars cannot cure an otherwise invalid indictment. *See, e.g., United States v. Cecil*, 608 F.2d 1294 (9th Cir.1979) (citing *Russell v. United States*, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962)).

Rosi's chief contention is that the indictment is flawed because by not identifying the states between which the money was transported, the indictment satisfied none of the *Bernhardt* factors outlined above. Rosi admits that this is "an apparent issue of first impression" and concedes that he could find no cases holding that an indictment charging violation of 18 U.S.C. § 2314 must name the states between which the interstate transport occurred.[4] He maintains, however, that this is because prosecutors routinely identify the states involved. *See, e.g., United States v. Urciuoli*, 575 F.2d 768, 769 (9th Cir.1978);

---

3. Section 2314 provides: "Whoever transports, transmits, or transfers in interstate or foreign commerce any . . . money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; . . . [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both." 18 U.S.C. § 2314 (West's 1977).

4. To support its position, the government analogizes to cases addressing the sufficiency of indictments brought under 18 U.S.C. § 922(g), felon in possession of a firearm. The government cites several cases, all from other circuits, in which courts have held that the failure of a Section 922(g) indictment to identify the states between

which the firearm had been transported or possessed did not render the indictment invalid. *See, e.g., United States v. McCarthy*, 862 F.2d 143, 145 (7th Cir.1988) (Court found that the language "did knowingly possess in and affect commerce" satisfactorily alleged the interstate commerce element of § 922(g) and allowed defendant to prepare his defense.); *United States v. Gillies*, 851 F.2d 492, 496 (1st Cir.1988) (Section 922(g) indictment that merely stated that the object gun "had previously traveled in interstate commerce" satisfied the requisite interstate commerce element of the offense.), *cert. denied*, 488 U.S. 857, 109 S.Ct. 147, 102 L.Ed.2d 119 (1988); *United States v. Lowe*, 860 F.2d 1370, 1373–74

*United States v. Mosley,* 786 F.2d 1330, 1334 (7th Cir.1986), *cert. denied,* 476 U.S. 1184, 106 S.Ct. 2919, 91 L.Ed.2d 548 (1986). Rosi further argues that because the indictment failed to identify the states between which the stolen money was transported, he has no guarantee that he was prosecuted based on the facts presented to the grand jury—one of the central purposes that an indictment serves. *See Bernhardt,* 840 F.2d at 1445. Indeed, he underscores that there were at least two other states involved, Hawaii and Colorado, on which the grand jury could have based its charge.

In the end, the "test is not whether the indictment could have been framed in a more satisfactory manner but whether it conforms to minimal constitutional standards." *United States v. Haas,* 583 F.2d 216, 219 (5th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1788, 60 L.Ed.2d 240 (1979); *see also United States v. Conlon,* 628 F.2d 150, 156 (D.C.Cir. 1980), *cert. denied,* 454 U.S. 1149, 102 S.Ct. 1015, 71 L.Ed.2d 304 (1982). While Rosi's indictment is not a model, its contents satisfy the minimum requirements to establish its sufficiency.

AFFIRMED.

(7th Cir.1988) (same), *cert. denied,* 490 U.S. 1005, 109 S.Ct. 1639, 104 L.Ed.2d 155 (1989).