**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jair De Jesus MEJIA, Defendant–**
**Appellant.**

**No. 91–50005.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 6, 1991.

Decided Dec. 24, 1991.

As Amended Feb. 19, and
March 25, 1992.

Hector C. Perez, Santa Ana, Cal., for
defendant-appellant.

Nancy B. Spiegel, Michael W. Fitzgerald, Asst. U.S. Attys., Narcotics Section, Crim. Div., Los Angeles, Cal., for plaintiff-appellee.

Before SNEED, BEEZER and TROTT, Circuit Judges.

SNEED, Circuit Judge:

Jair de Jesus Mejia appeals his conviction on one count of conspiracy to distribute cocaine. Mejia contests the trial court's adverse rulings on his motion to suppress evidence. He also contends the court erred in refusing to depart downward from the Sentencing Guidelines, and argues that the court's failure to grant him his right of allocution constitutes reversible error. We affirm.

## I.

### BACKGROUND

A. *Facts*

Mejia was one of several individuals who attempted to become a wholesaler of cocaine. He helped arrange shipments totalling 2251 kilograms of cocaine, the second largest amount ever seized in California. Mejia's role was a key one. He temporarily stored boxes of cocaine received from Colombia at his rented house and transported loads of the boxes by van from his house to a meeting place at a Howard Johnson's hotel. From the Howard Johnson's, the boxes were loaded onto two tractor trailers for interstate shipping.

Mejia also assisted another conspirator, Jose Rodriguez–Zapata, whose role was similar to Mejia's own. Rodriguez–Zapata temporarily stored boxes of Colombian cocaine at his house and delivered the boxes by pickup truck to a meeting place in a supermarket parking lot. Rodriguez–Zapata left the pickup truck parked in the lot. Later, Mejia used his van to bring a third codefendant, Guillermo Fernandez, to the supermarket lot. Fernandez drove Rodriguez–Zapata's pickup back to the Howard Johnson's and loaded the boxes of cocaine onto a third tractor trailer for shipping.

Howard Johnson's was the marshalling point for the cocaine being handled by Mejia, Fernandez, and Rodriguez–Zapata.

Investigating officers of the Anaheim Police Department and other law enforcement agencies apprehended the cocaine traffickers on December 16, 1989, after two days' intensive surveillance. At about 1:05 P.M., the officers stopped the first two tractor trailers on the highway. They questioned the drivers, Eduardo Alvarez and Ramon Quintana, along with Alvarez's passenger, Jose Sosa. At no time did the officers draw their guns or raise their voices, nor did they indicate that the suspects were under arrest. After several minutes of questioning, during which the suspects behaved cooperatively, Alvarez and Quintana each signed consent-to-search forms. The officers searched the trucks and found boxes of cocaine on board. The three suspects were arrested, received *Miranda* warnings, and made incriminating statements.

It was approximately 9:30 P.M. when plainclothes investigators arrived at Mejia's house. Mejia's wife, Gloria Cajigas, answered the door. The officers identified themselves as police and said they had come pursuant to a narcotics investigation. Cajigas let them in. The officers asked whether anyone else was home, and Cajigas answered, "Jair." She indicated that her husband was asleep in the bedroom. The officers asked her to wake him up. She walked to the bedroom, and did not protest when two officers followed her in. She awoke Mejia. The officers identified themselves to Mejia, and asked if they could talk in another room. All proceeded to the kitchen, where Mejia subsequently gave his signed consent to search the house. The officers found empty boxes of the same type found in the two tractor trailers searched earlier, and empty duffle bags of a type commonly used to transport cocaine. Mejia received *Miranda* warnings and made incriminating statements.

The officers next moved to arrest Fernandez and Rodriguez–Zapata. At about 10:40 P.M., officers questioned Fernandez at the Howard Johnson's. Fernandez gave them consent to search his hotel room and the third tractor trailer, which was still

parked in the hotel parking lot. The officers found boxes of cocaine on the trailer. Fernandez was arrested, received *Miranda* warnings, and made incriminating statements. Later, Rodriguez–Zapata was arrested at his house.

Throughout their investigation, the officers observed that defendants' conduct was consistent with known practices of cocaine traffickers and inconsistent with legitimate trucking operations. The officers observed the three tractor trailers parked empty for three days in the Howard Johnson's lot. They observed the defendants hastily loading U–Haul boxes onto the trucks. The defendants made no attempt to secure the loaded cargo to prevent its shifting during transit. Even after the cargo was loaded, the trucks remained nearly empty. Furthermore, officers saw the defendants make numerous pay phone calls to digital pagers, engage in countersurveillance driving, and hold a business meeting at the Howard Johnson's hotel restaurant, a meeting at which no food or drink was ordered. Finally, officers determined that Mejia's van was registered to a post office box.

### B. *Proceedings Below*

Mejia was charged with one count of conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1), 846. Mejia timely filed a motion to suppress the evidence of the seized cocaine, the items found at his house, and his own and his codefendants' statements, arguing that the evidence had been illegally obtained. At the hearing on the motion, the trial court heard testimony from some of the investigating officers, although not from the ones who had filed the police report on the search of Mejia's house. The court ultimately denied Mejia's motion to suppress. Mejia then conditionally pleaded guilty, explicitly reserving his right to appeal the court's rulings on the motion.

The court sentenced Mejia to 292 months in prison followed by five years' supervised release. Mejia's sentence, the shortest he could have received under the Sentencing Guidelines given his offense level of 40 and criminal history category of I, was consid-erably longer than the 120–month sentence received by Rodriguez–Zapata, even though the two men played similar roles in the conspiracy. Rodriguez–Zapata, however, received his shorter sentence after a successful suppression motion followed by a mistrial and a plea to a superseding information. The court was troubled by the disparity in sentences, because Mejia perhaps was less culpable than Rodriguez–Zapata. Despite this, it believed itself powerless to depart from the Guidelines.

During sentencing, the court did not afford Mejia an opportunity to speak in his own behalf. Mejia was thus denied his right of allocution.

Mejia appeals the trial court's rulings on his motion to suppress, seeking reversal and remand for further proceedings. Alternatively, he seeks reversal and remand for resentencing.

## II.

### *JURISDICTION AND STANDARDS OF REVIEW*

We have jurisdiction pursuant to 28 U.S.C. § 1291. In particular, we have jurisdiction to review the departure issue. Ordinarily, a discretionary refusal to depart downward would not be subject to appellate review. *United States v. Morales*, 898 F.2d 99 (9th Cir.1990) (construing 18 U.S.C. § 3742(a)). Here, however, the trial court's refusal to depart was not discretionary, but rather was based on the court's belief that it had no authority to depart.

Our catalogue of applicable standards of review must be described. We accept the trial court's findings of fact at the suppression hearing if the findings are not clearly erroneous. *United States v. Kerr*, 817 F.2d 1384, 1386 (9th Cir.1987). The trial court's conclusions as to the lawfulness of searches or seizures generally present mixed questions of law and fact, which we review de novo. *Id.; United States v. Thomas*, 863 F.2d 622, 625 (9th Cir.1988) (mixed questions of law and fact usually require de novo review, although clearly erroneous standard applies if the necessary analysis is predominantly factual

in nature). The question whether as a general rule certain types of actions give rise to an inference of consent to search is a question of law that we review de novo. *United States v. Shaibu*, 920 F.2d 1423, 1425 (9th Cir.1990). A trial court's decision whether to hold an evidentiary hearing on a motion to suppress is reviewed for abuse of discretion. *Center Art Galleries—Hawaii, Inc. v. United States*, 875 F.2d 747, 754 (9th Cir.1989).

The trial court's decision that it had no power to depart from the Sentencing Guidelines gives rise to a question of law that we review de novo. *United States v. Lira–Barraza*, 941 F.2d 745, 746 (9th Cir. 1991) (en banc). We review the court's failure to afford Mejia his right of allocution to determine whether the error was harmless. *See Coleman v. McCormick*, 874 F.2d 1280, 1288–89 (9th Cir.) (en banc), *cert. denied*, 493 U.S. 944, 110 S.Ct. 349, 107 L.Ed.2d 337 (1989).

### III.

### ANALYSIS

**A.** *Motion to Suppress: Seized Cocaine and Codefendants' Statements*

Mejia contends that the trial court wrongly admitted into evidence the cocaine seized from the tractor trailers and the statements of Mejia's codefendants. He argues that the investigating officers did not have reasonable suspicion to stop the tractor trailers driven by Alvarez and Quintana. Alternatively, he argues that Alvarez's and Quintana's roadside interrogations, and Fernandez's interrogation at the hotel, were tantamount to arrests, that these arrests were made without probable cause, and that any subsequent consent to search was not freely given. Under either theory, Mejia concludes that the evidence associated with the Quintana, Alvarez, and Fernandez arrests was tainted and should not have been admitted.

■ We disagree. The totality of the circumstances gave the officers probable cause for any arrests that may have taken place, and *a fortiori* reasonable suspicion to search. *See, e.g., United States v. Sokolow*, 490 U.S. 1, 8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (officers may rely on totality of circumstances in determining reasonable suspicion); *United States v. Del Vizo*, 918 F.2d 821, 827 (9th Cir.1990) (pattern of activity consistent with narcotics trafficking gave rise to probable cause). Although Mejia cites cases in which probable cause was not found, *e.g., United States v. Robert L.*, 874 F.2d 701, 704 (9th Cir.1989); *United States v. Freitas*, 716 F.2d 1216, 1220–24 (9th Cir.1983), none of these cases deals with a totality of circumstances like that of the instant case. Legitimate truck owner-operators generally cannot afford to let their vehicles remain in a parking lot for three days, nor can they afford to ride with their trucks nearly empty when loads would be easy to come by. Legitimate truck operators also do not load their cargo in hotel parking lots, and they carefully secure their loaded cargo as a safety precaution. The defendants' other activities, such as the pager calls and the evasive driving, would not by themselves sustain the officers' inference of illegal activity. But taken in context, these activities supported the officers' overall determination that the defendants were engaged in cocaine trafficking.

Because probable cause existed, we need not decide whether the defendants' interrogations constituted arrests. We need only note that consent to search was freely given in all cases. The investigating officers used no coercion or threats of force, and the defendants cooperated freely with the officers' questioning. We hold that the evidence of the seized cocaine and of Mejia's codefendants' incriminating statements was legally obtained and was properly admitted.

**B.** *Motion to Suppress: Items Found in Mejia's House and Mejia's Own Statements*

Mejia also contends that the evidence seized at his house and the statements he made must be suppressed because his wife's consent to enter the house was the direct product of an unlawful seizure, namely, the seizure of the contraband from the tractor trailers. Whatever might have been the merits of this contention, it, too, fails because the seizure of the contraband was not unlawful.

Mejia further contends that the evidence and statements from his house must be

suppressed for other reasons. He argues that the scope of Cajigas's consent did not permit the officers to enter his bedroom. Alternatively, Mejia argues that the officers' presence in his bedroom constituted an illegal arrest, the fruits of which could not be admitted into evidence. Moreover, he argues that the government failed to prove that Mejia's subsequent consent to search the house was freely given. Each of these arguments is now considered.

1. Cajigas gave the officers implied consent to enter Mejia's bedroom.

 Mejia correctly asserts that consent to enter one's threshold for the limited purpose of talking about an investigation does not include permission to enter a bedroom occupied by a sleeping spouse. Thus, Cajigas's invitation to enter the house did not, without more, give the officers permission to enter every room in the house.

 However, once the officers were in the house, Cajigas gave a subsequent implied consent to let them enter the bedroom by not objecting when the officers followed her into the bedroom. Presumably, a reasonable person who objected to the officers' following her would have said so. The officers could reasonably interpret Cajigas's behavior to mean that she was leading them to her husband in response to their request. No evidence was presented to indicate that the officers engaged in any inappropriate behavior, or that they in any way coerced Cajigas. The trial court did not commit clear error by finding that Cajigas consented to the officers' presence in the bedroom.

Mejia points to this court's statement in *United States v. Shaibu* that "free and voluntary consent cannot be found by a showing of mere acquiescence to a claim of lawful authority." *United States v. Shaibu,* 920 F.2d 1423, 1426 (9th Cir.1990) (citation omitted). He argues that Cajigas's "mere acquiescence" to the officers' accompanying her to the bedroom was not sufficient to amount to consent. However, *Shaibu* is distinguishable. It involved the issue of implied consent to enter a dwelling, rather than the issue of implied consent to enter a room within that dwelling

after express consent to enter the dwelling had been given. The *Shaibu* court based its holding on the principle that the right of a person to retreat into his or her own home and there be free from unreasonable governmental intrusion stands at the core of the Fourth Amendment. *Id.* at 1425 (citing *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961)). While the question of what constitutes unreasonable governmental intrusion is present here, there was no retreat here. Cajigas did not "retreat" to the bedroom. She entered and was followed by two officers without any indication that they were not expected to do so.

 Mejia objects that a holding that a person may give implied consent to enter a room impermissibly shifts to the defendant the burden of proving the absence of "unequivocal and specific" consent. *Id.* at 1427–28 (quoting *United States v. Page,* 302 F.2d 81, 83 (9th Cir.1962)). That is not so. If, as a matter of law, implied consent to search may be given, the defendant's protest at that time, or its absence, is simply a fact to be considered in determining whether the government has established implied consent. Here, Cajigas may have felt uncomfortable objecting to the officers' following her into the bedroom; we simply do not know. It is also possible that she felt no discomfort; again, we do not know. The overt manifestations of consent existed. That is all we know. That is enough. The government met its evidentiary burden. Unlike *Shaibu,* this was not a case where the government attempted "to justify entry by consent and consent by entry." *Id.* at 1427.

 Mejia asserts that the trial court should not have based its finding of consent on a mere police report, but should have put the investigating officers on the witness stand. This argument is unpersuasive. True, the government had the burden of proving by convincing evidence that the officers exerted no express or implied coercion. *Id.* at 1426. However, the purpose of an evidentiary hearing (and by implication, of obtaining the testimony of particular witnesses at such a hearing) is to resolve contested issues of fact going to

the validity of the search. *See Center Art Galleries—Hawaii, Inc. v. United States,* 875 F.2d 747, 754 (9th Cir.1989). Here, the contest is over the legal significance of undisputed facts rather than over the facts themselves. No doubt the officers, had they testified, would have relied on the police reports to refresh their recollection. The trial court's choice to rely on the police report was not an abuse of discretion.

2. The officers' presence in the bedroom did not constitute an arrest.

■ Mejia asserts that the officers' entry into his bedroom constituted a baseless arrest, and that therefore his subsequent consent to let the officers search the house was, presumptively, "fruit of the poisonous tree." He argues that a person who is awakened in his bedroom at 9:30 P.M. and finds two plainclothes investigators who identify themselves as police would believe that he was not free to leave. Given that the officers had permission to enter the bedroom, this argument fails. Cajigas, not the officers, awoke Mejia. The officers did not draw guns or use coercion. A reasonable person in Mejia's position would have felt free to leave, or, more reasonably, to have asked the officers to leave the bedroom or to leave the house. *See Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (a person who reasonably feels free to leave is not seized for purposes of the Fourth Amendment). Mejia did none of these things. The officers' presence in Mejia's bedroom did not constitute an arrest.

Mejia's reliance on *Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), is misplaced. In *Orozco,* four police officers arrived at the defendant's boarding house, were admitted by an unidentified woman, and were told that the defendant was asleep in the bedroom. The officers entered the bedroom and began to question the defendant. The Supreme Court held that the interrogation was custodial in na-

ture for purposes of the Fifth Amendment, so that the defendant was entitled to receive *Miranda* warnings before interrogation. *Orozco*'s analysis did not focus on the issue of arrest. In particular, the Court did not face the question whether the defendant would reasonably have felt free to leave or to ask the officers to leave, but relied on officers' testimony that the defendant was under arrest and not free to leave. *Id.* at 327, 89 S.Ct. at 1097.[1] Moreover, *Orozco* is factually distinguishable from Mejia's case. Whereas in *Orozco* the officers began interrogating the defendant while still in his bedroom, the officers here waited until Mejia had arisen and all parties had moved into the kitchen before beginning their questioning. This strongly suggests that Mejia would have felt more free to leave or to refuse questioning than the defendant in *Orozco* would have felt. In sum, *Orozco* does not stand for the proposition that being awakened at night in one's room in the presence of officers necessarily constitutes arrest.

C. *Downward Departure from Sentencing Guidelines*

■ Mejia urges that he should be granted a downward departure from the Sentencing Guidelines because his relative lack of culpability in comparison with Rodriguez–Zapata is a mitigating circumstance not adequately taken into consideration by the Sentencing Commission. *See* 18 U.S.C. § 3553(b).

Ninth Circuit law is consistent with the proposition that avoiding the unequal treatment of codefendants is not an acceptable basis for an upward departure from the Guidelines. In *United States v. Enriquez–Munoz,* 906 F.2d 1356 (9th Cir.1990), this court held that sentencing disparity among codefendants could not serve as a basis for upward departure. In *United States v. Carpenter,* 914 F.2d 1131 (9th Cir.1990), the court affirmed an upward departure that *created* a sentencing disparity, noting that although a disparity could not serve as the basis for upward departure, by the

1. To the extent *Orozco* suggests that a finding of arrest should be based on the would-be arresting officer's subjective intent, it is at odds with the Court's later announcement in *Royer* of an objective test based on what a reasonable person in defendant's place would have felt. *See* 2

Wayne R. LaFave, *Search & Seizure,* § 5.1(a), at 388–89 (2d ed. 1987). This court has recognized that arrest is reviewed "from the perspective of the person seized." *United States v. Delgadillo–Velasquez,* 856 F.2d 1292, 1295 (9th Cir.1988).

same token nothing precluded an upward departure resulting in a disparity if the upward departure had other justification and was otherwise reasonable. *Id.* at 1135–36; *see also United States v. Hoy,* 932 F.2d 1343, 1345 (9th Cir.1991) (*Carpenter* stands for the proposition that sentencing disparity among codefendants is not, by itself, sufficient ground for attacking an otherwise proper sentence under the Guidelines).

This court has specifically reserved the question whether a district court may depart *downward* for the purpose of avoiding unequal treatment of codefendants. *Enriquez–Munoz,* 906 F.2d 1360 n. 8.[2] We now answer that question in the negative. Basic notions of fairness dictate that defendants should be sentenced in proportion to their crimes. The Sentencing Guidelines attempt to ensure that all defendants receive like sentences for like crimes. A downward departure to correct sentencing disparity brings a defendant's sentence more into line with his or her codefendant's sentence, but places it out of line with sentences imposed on all similar offenders in other cases. *See Enriquez–Munoz,* 906 F.2d at 1359–60. The greater uniformity trumps the lesser disparity. Moreover, allowing a defendant's sentence to be reduced on account of a codefendant's plea bargain may tend to discourage the government from offering plea bargains in cases involving multiple defendants. This result should be avoided on grounds of judicial efficiency. *Id.* at 1359. We hold that the district court did not err in refusing to depart downward for the purpose of avoiding unequal treatment of codefendants.

## D. *Right of Allocution*

 Mejia asserts for the first time on appeal that at his sentencing hearing he was entitled to address the trial court in person, rather than merely through his attorney, in order to make a statement that could lead to mitigation of his sentence. Fed.R.Crim.P. 32(a)(1)(c). The government

does not dispute that the court erred in failing to let Mejia speak in his own behalf. However, the government asserts that because Mejia's sentence was already as short as it could possibly be under the Guidelines, anything he might have said would not have affected his sentence. Thus, the government argues, the court's error was not reversible.

We agree. As already indicated, the trial court granted Mejia a two-level downward adjustment for acceptance of responsibility, U.S.S.G. § 3E1.1(a), and gave him the shortest sentence permitted for a defendant with his offense level and criminal history. In other words, the court used all the discretion it had available. As the court was correct in assuming that it had no authority to depart from the Guidelines on the basis of sentencing disparity among codefendants, and as it had no other basis for departure, its allocution error did not affect Mejia's sentence. Furthermore, its error was not of constitutional magnitude. As the Supreme Court announced in *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962), and as this court recently reaffirmed in *Boardman v. Estelle,* No. 90–55238, slip op. at 105, 113, 1992 WL 1615 (Jan. 9, 1992), where a sentencing court fails to ask a defendant whether he has anything to say in his own behalf before the sentence is imposed, the error is not of constitutional dimension, so long as the defendant is not affirmatively denied the opportunity to speak. Unlike the defendant in *Boardman,* Mejia did not even request to speak. We conclude that the trial court's failure to afford Mejia his right of allocution did not constitute reversible error.

AFFIRMED.

---

2. In *United States v. Ray,* 930 F.2d 1368 (9th Cir.1990), a divided panel of this court sanctioned a downward departure made to correct a disparity engendered by the Ninth Circuit's now-overruled declaration that the Guidelines were unconstitutional. The holding was narrow and

not meant to extend beyond the extraordinary circumstance presented by cases in which certain codefendants are sentenced under the Guidelines while others are not. *Id.* at 1373; *see United States v. Boshell,* 952 F.2d 1101, 1107–1108 (9th Cir.1991).