UNITED STATES of America,
Plaintiff–Appellee,

v.

Gerald ORTLAND, Defendant–Appellant.

No. 96–10175.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 11, 1997.

Decided March 18, 1997.

Erik Babcock and Paul Wolf, Oakland, CA, for defendant-appellant.

Wayne Lamprey, Assistant United States Attorney, San Francisco, CA, for plaintiff-appellee.

Before: BRUNETTI, FERNANDEZ, and HAWKINS, Circuit Judges.

Opinion by Judge FERNANDEZ; Concurrence by Judge Hawkins.

FERNANDEZ, Circuit Judge:

Gerald Ortland appeals his jury conviction and sentence for mail fraud. *See* 18 U.S.C. §§ 1341, 1346. He claims that his conviction should be reversed because evidence was admitted in violation of his attorney-client privilege, because testimony of an expert witness was excluded, and because he was not permitted to show that his former wife, Patricia Ortland, had fled. He also asserts that the district court committed various sentencing errors. We affirm his conviction but vacate his sentence and remand for resentencing.

## BACKGROUND

A grand jury indicted Gerald Ortland and his then-wife Patricia Ortland on five counts of mail fraud spanning the period from August, 1986 to July, 1990. The Ortlands were charged with defrauding investors of Three El Sobrante, a partnership that they created to develop residential real estate. Before trial, Patricia tried several times to have the trial continued. When the court rejected her delaying tactics, Patricia fled. At the time of trial, she had not been located, and Gerald's trial was severed from hers.

Gerald and Patricia were the two general partners in the limited partnership, Three El

Sobrante, which they formed to raise the capital necessary to purchase and develop land. Gerald used many of the contacts he had gained as a stockbroker to solicit funds for the partnership. Ultimately, the partnership built several homes on previously undeveloped land. During the course of the partnership, the Ortlands withdrew and diverted substantial sums of money from Three El Sobrante's accounts. They used much of the money for their personal expenses. They also took several steps to hide the amount of funds they had taken from the partnership. At trial, Ortland argued that the partnership agreement did not prohibit him from withdrawing the money, that he was unaware of any wrongdoing because Patricia hid important facts from him, and that he had only done what Patricia told him to do. The court prohibited Ortland from calling an expert witness to explain the meaning of the partnership agreement. The government presented evidence that Ortland knew what his wife was doing and that he actively participated in the fraud.

The Ortlands asked Mark Ericsson, an attorney who had previously worked for them, to help them draft the Three El Sobrante limited partnership agreement. The court denied Ortland's pretrial motion to quash a subpoena to Ericsson and admitted Ericsson's testimony at trial over Ortland's objection. The court found that Patricia and Gerald both waived their attorney-client privilege with regard to any communications they had with Ericsson about the partnership agreement.

Ericsson testified that he did not remember any specific conversations with Gerald; he testified largely in generalities based on what he thought he would have told clients. He testified that he drafted the partnership agreement based on an agreement he had drafted earlier for a different Ortland partnership, but he made changes to the agreement based on conversations where both Patricia and Gerald were present. He said that he had explained the provisions relevant to this action to Gerald and Patricia. He indicated that Gerald was paying less attention than Patricia, however.

Many people who worked in the Ortlands' office also testified for the government. For example, Doris Watson, a bookkeeper with many years of experience, worked for the Ortlands from 1986 until she resigned in 1990. She kept the books for four different Ortland entities, including Three El Sobrante. She frequently told Patricia that it was improper for her to use Three El Sobrante money for personal items; she told Patricia the money was not hers and that she would have to pay it back. Gerald was present during at least one of these conversations and "seemed angry." Interestingly enough, at one point Gerald, Patricia, and Watson all drove together to Ericsson's office "to see what [they] could do about the partnership agreement and what it really spells out." After this meeting the Ortlands told Watson they were "having the agreement amended." There never was an amendment. Watson, however, also aided in the commission of improprieties, by, for example, preparing false financial statements and false copies of tax returns. At one point, early in her employment, Patricia told her that she should keep information from Gerald and that the "[less] that Jerry knew the better."

Jay Margrey testified that he worked as the Ortlands' office manager from 1986 until 1988, and confirmed the purport of Watson's statements. He added that he overheard three or four conversations where Gerald was present and was told by Watson that money could not be taken from Three El Sobrante for other projects. At each conversation, Gerald became very angry. Karl Schunck, an accountant, also worked for the Ortlands. He told Gerald that the Ortlands were not entitled to fees from Three El Sobrante. Schunck explained to Gerald that, under the partnership agreement, the Ortlands were not entitled to obtain fees until the completion of the project. When Gerald became angry at Schunck's opinion, Schunck recommended that Gerald consult an attorney. Finally, the government called an accountant as an expert witness. Paul Ainslie testified that the Ortlands diverted a total of $1,458,671 from the Three El Sobrante account.

After the jury convicted Ortland, the district court sentenced him to 41 months of imprisonment and the maximum fine of $75,000. The court did not order restitution. This appeal followed.

## STANDARDS OF REVIEW

■ We review de novo a determination that there has been a waiver of the attorney-client privilege. *See United States v. Plache,* 913 F.2d 1375, 1379 (9th Cir.1990); *United States v. Mendelsohn,* 896 F.2d 1183, 1188 (9th Cir.1990). The district court's decision not to hold an evidentiary hearing is reviewed for abuse of discretion. *See United States v. Mejia,* 953 F.2d 461, 465 (9th Cir. 1992). Contrary to Ortland's assertion, a "district court's decision to admit expert opinion testimony is reviewed for abuse of discretion." *United States v. Castaneda,* 94 F.3d 592, 595 (9th Cir.1996). Similarly, a district court's rulings on admission of other evidence "are reviewed only for an abuse of discretion." *United States v. Collicott,* 92 F.3d 973, 978 (9th Cir.1996).

■ We review ex post facto challenges to sentencing decisions de novo. *See United States v. Castro,* 972 F.2d 1107, 1111 (9th Cir.1992). Finally, we review a district court's interpretation and application of the Sentencing Guidelines de novo, but review its underlying factual findings for clear error. *See United States v. Mende,* 43 F.3d 1298, 1302 (9th Cir.1995).

## DISCUSSION

### A. Waiver of Attorney–Client Privilege

Ortland argues that attorney Ericsson's testimony was admitted in violation of his attorney-client privilege because the district court erred when it decided that he had impliedly waived the privilege. He also claims that the court abused its discretion by not holding an evidentiary hearing before ruling on this issue.

■ We have generally held that, in order to waive the attorney-client privilege, the client must disclose the contents of a confidential communication. *See Weil v. Investment/Indicators, Research & Management,*

*Inc.,* 647 F.2d 18, 24 (9th Cir.1981). Nonetheless, the "attorney-client privilege is strictly construed," and there are other circumstances under which we will find a waiver. *Id.* Even when a party does not explicitly disclose the content of an attorney-client communication, he may waive the privilege implicitly. A person cannot always claim that he relied on counsel, while protecting what was said between them from disclosure. As we have said: "The privilege which protects attorney-client communications may not be used both as a sword and a shield. Where a party raises a claim which *in fairness* requires disclosure of the protected communication, the privilege may be implicitly waived." *Chevron Corp. v. Pennzoil Co.,* 974 F.2d 1156, 1162 (9th Cir.1992)(emphasis added) (citation omitted); *see also Glenmede Trust Co. v. Thompson,* 56 F.3d 476, 486 (3d Cir.1995); *Conkling v. Turner,* 883 F.2d 431, 434 (5th Cir.1989); *GAB Bus. Servs., Inc. v. Syndicate 627,* 809 F.2d 755, 762 (11th Cir. 1987); *Sedco Int'l, S.A. v. Cory,* 683 F.2d 1201, 1206 (8th Cir.1982).

The facts show that Gerald did attempt to parry the government's thrust by telling the government investigators and attorneys that he had relied on his attorney's advice and counsel. At the same time he wanted to shield the content of that advice and counsel from discovery. In particular, on September 2, 1992, before the grand jury indicted Gerald and Patricia, the Ortlands went to the United States Attorney's office, with their counsel, in an attempt to convince the government that they lacked criminal culpability. They met with an Assistant United States Attorney, an FBI Agent, and an IRS Agent. The FBI and IRS Agents each prepared at least one memorandum memorializing the meeting. In general, Gerald claimed that he and Patricia had not intentionally done anything wrong and had merely followed Ericsson's directions.

At trial, Gerald's opposition was slightly different, although it was a variation on the theme. Gerald said that he relied solely upon his then spouse, who had kept him in the dark about whether he, or she, was doing anything wrong. Implicit in *that* defense was his ignorance of what the preparer of the

agreement said he could do because his options had not been explained to him by the preparer-his attorney. Nevertheless, he did not expressly take the position that he had relied upon his attorney's advice or lack thereof.

This case, then, does raise interesting and complex issues regarding the attorney-client privilege: (1) Can a formal meeting with prosecutors where the target of an investigation seeks to deflect proceedings by claiming reliance on his attorney ever suffice to impliedly waive the attorney-client privilege? (The question is particularly acute where, as here, the prosecutors see no need to speak with the attorney and simply proceed against the target); (2) Does a claim at trial which, in effect, indicates ignorance of the nature of a complex legal document prepared by the accused's attorney amount to a claim of bad legal advice and, thus, constitute an implied waiver? *See Livingstone v. North Vernon Borough,* 91 F.3d 515, 536–37 & n. 37 (3d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1311, —— L.Ed.2d —— (1997). Although the issues are interesting, we need not and do not resolve them because in light of the record in this case, even if the evidence were wrongly admitted, the error was harmless.

 We will find errors in admission of evidence harmless "unless the reviewing court has grave doubt whether the erroneously admitted evidence substantially affected the verdict." *Collicott,* 92 F.3d at 984. This in turn simply means that "there is a fair assurance that the error in the case was harmless," *United States v. Crosby,* 75 F.3d 1343, 1349 (9th Cir.1996), or, what amounts to the same thing, that the error was "more likely than not harmless," *Collicott,* 92 F.3d at 984. In this case, the error was harmless in light of the lackluster testimony by Ericsson and all of the other evidence of Ortland's guilt. This was not a case where the attorney expressly advised his client that he was violating the law or where there was little evidence of guilt beyond the attorney's testimony. *Cf. Collicott,* 92 F.3d at 984. Instead, the government presented evidence from many people who worked for the Ortlands. It showed that Gerald, an experienced businessman, knew that he was acting improperly when he used Three El Sobrante funds for many personal projects, commingled various ventures' funds, and took unauthorized fees from the partnership. Other evidence showed that Ortland manufactured antedated invoices for work purportedly done by him and that he had contractors bill the partnership for work done on his private property. Moreover, he and Patricia managed to divert the substantial sum of $1,458,671 from the partnership's account-not exactly a small accounting mishap of some sort. All of this was a powerful, even overwhelming, indication that Gerald must have known that he was doing the wrong thing.

Ericsson's testimony, on the other hand, was not at all strong. He had no specific recollection about what Gerald himself might have asked or about what he might have told Gerald. He simply recalled that he must have explained the provisions because that was his practice. The time he remembered going over the partnership agreement in detail, Patricia was paying a lot of attention but Gerald was "walking around part of the time." [1] When that testimony is compared with the other evidence in this case we certainly have a fair assurance that in context the admission of Ericsson's testimony was harmless, even if it was error.

### B. Exclusion of an Expert Witness

Ortland proffered an expert, Todd Werby, who would testify that the partnership agreement did not guarantee that cash would be available to pay the limited partners a distribution, did not limit the types of services the general partners could provide to the partnership, and allowed the general partners to be reimbursed for "everything related to" Three El Sobrante. The district court rejected this proffered testimony. It determined that the testimony would not assist the jury because the relevant question was not what an expert thought the agreement said, but what Ortland *thought and said* the

---

1. Interestingly, the government put very little weight on Ericsson's testimony at closing argument.

agreement allowed him to do. We find no abuse of discretion.

■ Federal Rule of Evidence 702 permits the introduction of expert testimony if it will "assist the trier of fact." A district court does not abuse its discretion when it refuses expert testimony where the subject does not need expert "illumination" and the proponent is otherwise able to elicit testimony about the subject. *Castaneda,* 94 F.3d at 596.

■ In this case, Werby's testimony was largely irrelevant. Werby could not speak to the issues of what Ortland believed the agreement provided and what Ortland told investors. It was undisputed by Gerald that his belief was not based upon the words of the agreement-it was based upon what his spouse said, or upon what his attorney had or had not told him, or both. Also, Werby's belief that the Ortlands could be reimbursed for expenses related to Three El Sobrante would not help the jury decide whether Ortland took partnership money for non-related expenses, such as his cars and homes, or inflated the amount of time he spent on the project when he drew up invoices, or directed money to other projects. Similarly, the fact that Werby believed that the agreement did not limit the types of services the Ortlands could provide to the partnership does not speak to the question of how or when the Ortlands were or were not to be paid for those services. This proffered testimony could not have assisted the jury in determining "a fact in issue." Fed.R.Evid. 702. This is not to say that the district court could not have decided otherwise; it is only to say that its discretion was not abused.

## C. Exclusion of Evidence of Patricia's Flight

The district court admonished counsel for both parties not to mention "anything that sets up the suspicion in the jurors' mind that [Patricia] has fled." Nonetheless, the court frequently allowed Gerald's counsel to cross-examine witnesses regarding the Ortlands' relationship and to create the inference that Patricia was the dominant partner who frequently told Gerald what to do. Moreover, he elicited testimony from Watson that Patricia believed the less Gerald knew, "the bet-

ter." Finally, despite the earlier admonition, the court permitted defense counsel to state repeatedly that Patricia had left Gerald to answer the charges and that she had "dumped it on him."

■ We conclude that the district court did not abuse its discretion when it allowed Gerald extensive latitude in arguing that Patricia was actually guilty of all crimes charged, but refused to admit the evidently irrelevant fact that Patricia had fled. We have already rejected the idea that a co-defendant's flight is relevant to show the guilt of anyone other than the fleeing defendant. *See United States v. Candoli,* 870 F.2d 496, 501 (9th Cir.1989). Similarly, it does *not* tend to show that someone else is innocent, at least it does not do so where there can easily be more than one guilty person.

In this case, Ortland has completely failed to show how Patricia's flight, and thus her consciousness of her own guilt, somehow showed that Gerald was not guilty. *Cf. id.* at 501–02. The fact of Patricia's guilt simply does not eliminate or even undermine the possibility that Gerald is also guilty. Of course, a jury might have taken it as some indication that he believed in his own innocence. *See id.* at 501. But the district court did not have to admit it for *that* improper purpose. His belief was not relevant, and his remaining here was the duty imposed upon him by law. Accordingly, the court did not abuse its discretion.

## D. Sentencing Issues

Gerald mounts four attacks upon his sentence. He asserts that his sentence on the first four counts violated the ex post facto clause. U.S. Const. Art. I, § 9, cl. 3. He also claims that the district court erred when it calculated the amount of the loss he caused, when it denied him an adjustment as a "minor" participant, and when it levied a fine against him. We agree with his first claim but reject the rest.

### 1. Ex Post Facto Concerns at Sentencing

Gerald argues that the court violated the ex post facto clause by sentencing him under Guidelines which were not in effect at the

time of his earlier crimes. We agree, and thus must vacate his sentence and remand for resentencing. *See Hamilton v. United States,* 67 F.3d 761, 765 (9th Cir.1995)(our role is to remand and direct use of proper Guidelines on resentencing).

The conduct charged in four of the five counts of conviction occurred before November 1, 1989, when the Guidelines section for calculating loss in a fraud case was amended. The fifth count covers conduct which occurred in December, 1989, after the amendment. The court calculated the loss as approximately $886,000. Under the 1988 version of § 2F1.1, a loss of $886,000 increases the Guidelines offense by 8 levels; under the 1989 through 1994 versions, an $886,000 loss increases the offense by 11 levels. The presentence report in this case noted no ex post facto problems and used the November 1, 1994 version of the Guidelines. That version includes the November 1, 1989 amendment and calls for an 11–level increase. At sentencing, the court adopted the sentencing ranges in the presentence report and applied the 1994 Guidelines' 11–level increase. The court ruled that there was no ex post facto problem with application of the 1994 Guidelines because the conduct charged in the fifth count occurred after the amendment.

■■■■■ When a law has retrospective application which disadvantages the offender affected by it, its application is prohibited by the ex post facto clause. *Hamilton,* 67 F.3d at 764. Therefore, when application of a version of the Guidelines enacted after the offense leads to a higher punishment than would application of the Guidelines in effect at the time of the offense, there is an ex post facto problem. *Id.* We hold that application of the 1994 version of § 2F1.1 to Ortland's pre-December, 1989 conduct disadvantaged Ortland and created an ex post facto violation, as to *those* counts. Even if the later offense is sentenced at the higher level, that does not undercut the fact that the earlier offenses cannot be.

The district court implicitly followed a Guidelines policy statement when it sentenced all five counts under the 1994 Guidelines. Effective as of the November 1, 1993

Guidelines, USSG § 1B1.11(b)(3) p.s. explains that, "If the defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual should be applied to both offenses." The Sentencing Commission opines that "the *ex post facto* clause would not bar application of the amended guideline to the first conviction; a contrary conclusion would mean that such defendant was subject to a lower guideline range than if convicted only of the second offense." USSG § 1B1.11 p.s., comment. (backg'd) (Nov.1994). In doing so, the Commission analogized to relevant conduct calculations, not to ex post facto cases, to support its assertion.

■■■■■ We have not previously applied policy statement § 1B1.11(b)(3). Generally speaking, Commission policy statements *are* binding on us. *See Williams v. United States,* 503 U.S. 193, 200–01, 112 S.Ct. 1112, 1119, 117 L.Ed.2d 341 (1992); *United States v. Plunkett,* 94 F.3d 517, 518 (9th Cir.1996). However, we need not apply the Guidelines where they *would* violate the Constitution, regardless of the intent of the Commission. *See Stinson v. United States,* 508 U.S. 36, 45, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993); *see generally United States v. Johns,* 5 F.3d 1267, 1272 (9th Cir.1993). Under the facts of this case, we find that the policy statement § 1B1.11(b)(3) violates the ex post facto clause of the constitution.

We *have* required all single-count conduct to be sentenced under a single Guidelines manual. *United States v. Warren,* 980 F.2d 1300, 1306 (9th Cir.1992). Clearly, the Sentencing Commission agrees with that approach. *See* USSG § 1B1.11(b)(2) (adopted for sentences on or after November 1, 1992). We have also required that all continuing offenses be sentenced under one Guidelines manual: the later one. *See United States v. Morales,* 11 F.3d 915, 917 (9th Cir.1993).

However, we have applied more than one Guidelines manual to multiple counts involving offenses completed at different times, and we must do so in this case. *See Castro,* 972 F.2d at 1112. In *Castro,* the defendant

was convicted of one conspiracy count and five counts of cocaine possession. *Id.* at 1108. The district court sentenced him under the 1989 Guidelines for all six counts, although the conduct underlying three of the possession counts occurred before the 1989 Guideline amendments. *Id.* at 1112. We held that the 1989 Guidelines were properly applied to the conspiracy count, because conspiracy is a continuing offense and at least some of the conspiracy's acts occurred after the amendments. *Id.* On the other hand, we reversed and remanded for resentencing under the 1988 Guidelines for the three earlier possession counts. We suggested that use of the 1989 Guidelines violated the ex post facto clause. *Id.* In *Castro,* we noted that possession is not a continuing offense and expressly rejected the government's argument that, because some of the offenses occurred after the Guideline amendments, all counts could be sentenced under the 1989 Guidelines. *Id.*

Similarly, we have used different sets of laws for different counts when what was involved was application of pre-Guidelines law and the first Guidelines, instead of a dispute over two versions of the Guidelines. *See United States v. Niven,* 952 F.2d 289, 293 (9th Cir.1991), *overruled in part by United States v. Scarano,* 76 F.3d 1471, 1477 (9th Cir.1996)(overruling the double jeopardy portion of *Niven*). In *Niven,* the defendant argued that the later Guidelines law, and not the pre-Guidelines sentencing scheme, should apply to all of his mail and wire fraud counts of conviction, although some of the counts involved conduct completed before the Guidelines became effective. *Id.* at 291, 293. Thus, he did not raise an ex post facto claim. We first held that mail fraud is not a continuing offense and then held that the defendant was properly sentenced under the pre-Guidelines law for the early counts and under the Guidelines for the later counts. *Id.* at 293. Thus, like *Castro, Niven* explained that completed offenses should be sentenced under different laws when they were completed at different times, and *Niven* added that mail fraud, the offense of all five counts of conviction in this case, is a completed rather than a continuing offense.

Application of the policy statement in this case would violate the Constitution; its application would cause Ortland's sentence on earlier, completed counts to be increased by a later Guideline. Moreover, the Commission's explanation is not entirely logical. The harm caused by the earlier offenses *can* be counted in sentencing the later one. *See Scarano,* 76 F.3d at 1477. That does not mean that the punishment for the earlier offenses themselves can be increased, simply because the punishment for the later one can be. In fact, were the later count to fall at some time after sentencing, all that would remain would be the earlier sentences, which would be too long. There are, in fact, five separate crimes; each carries its own punishment, even if the sentences *are* all run concurrently to the extent that they overlap. We therefore vacate the sentence and remand so that the district court can sentence Gerald under the 1988 Guidelines on counts one through four and under the 1994 Guidelines on count five.

**2. Loss Calculation at Sentencing**

Gerald argues that the district court miscalculated the amount of loss his actions caused because the court incorrectly included consequential damages in the loss calculation. We disagree.

The presentence report calculated the loss in this case as $886,000, and the district court adopted that calculation. To reach that point, the court and the presentence report took the amount of money invested and subtracted the amount of money that the receiver appointed to manage Three El Sobrante returned to investors. When asked by the defense attorney to exclude the receiver's fees of $92,000 and the $59,000 in fees the receiver paid to attorneys, the court said that the fees were necessary to reduce the loss to investors, and that it "wouldn't even consider" reducing the loss valuation.

Guideline § 2F1.1 governs valuation of loss in a fraud case. The 1994 version refers to the theft loss guidelines, § 2B1.1. *See* USSG § 2F1.1, comment. (n.7). We have reasoned that valuation under the theft loss Guideline, § 2B1.1, does not include consequential damages. *United States v. Newman,* 6 F.3d 623,

630 (9th Cir.1993). In *Newman,* we ruled that the sentencing court improperly considered the cost of arson fire-suppression and should only have considered the amount of property damage caused by the arson. *Id.* We said that calculation of consequential damages for arson or theft[2] "would be too complex and would not necessarily reflect the defendant's culpability accurately." *Id.* Moreover, "[i]f the Sentencing Commission had intended to include consequential losses, it could have included them in the definition of loss." *Id.*

On the other hand, we have rejected a claim that all somewhat indirect fraud losses are the type of "consequential" damages that cannot not be considered under § 2F1.1. In *United States v. Mende,* we found that the claimed actual losses were a direct result of the defendant's conduct and thus were not barred as consequential damages. 43 F.3d 1298, 1302–03 (9th Cir.1995). In *Mende,* the defendant defrauded banks out of $3,000,000 in advance fees. In addition to this $3,000,000, the court counted as loss the $13,000,000 incurred by the victim banks when loans guaranteed by the defendant defaulted. Those guarantees prompted the making of the loans, but the guarantees were only accepted because of fraudulent financial statements submitted by the guarantors. The defendant in *Mende* argued that the banks' only actual loss was $3,000,000, and that the defaulted loans caused only consequential damages. *Id.* at 1302. We disagreed and held that the district court's finding that the defaulted loans were the direct result of the defendant's fraud and were not consequential was not a clearly erroneous determination. *Id.* at 1303.

■ In this case, the frauds were used to extract funds from the investors for purchase of partnership interests, and only a portion of the funds was repaid. In order to obtain repayment, certain fees and costs were incurred and came out of the recovery, or so the district court could properly determine, as it did. Thus, there were *no* consequential damages at all; the actual loss to the investors was simply what they did not recover.

*See generally* USSG § 2B1.1, comment. (n.2) (Nov.1994). Here, the Ortlands extracted $X on the basis of certain fraudulent promises. As a result of the fraud, the investors only got $X—$Y back, instead of $X + $Z as promised. Their loss was at least $X—$Y, even if part of "Y" happened to be the cost of getting the fraudulently extracted money back by winding up the partnership. There is nothing "consequential" about that; it is part of the direct loss. To put it another way, the fraud was the obtaining of the money for the partnership interest, and when the dust settled that interest turned out to be worth the lesser net amount.

Therefore, the district court properly found that the actual loss to the investors was the total amount they did not regain. The loss was properly calculated under either version of the Guidelines because Gerald has done nothing to show that the loss was merely consequential or that the court's factual finding that it was a direct loss was clearly erroneous.

### 3. Minor Participation in the Offenses for Sentencing Purposes

■ Gerald also contends that the district court erroneously denied him an adjustment for his allegedly minor role in the offense. At the district court, he asked for an offense-level reduction based on his allegedly *minimal* role in the offense. The district court determined that his participation was not minimal. On appeal he argues for the first time that his conduct was *minor.* We hold that Ortland waived any claim that his role in the offense was minor when he did not request a reduction for minor participation in the district court. *See United States v. Flores–Payon,* 942 F.2d 556, 558 (9th Cir.1991).

### 4. Excessive Fine

Finally, Gerald argues that, because the district court found that he did not have the ability to pay a fine, it erred by imposing a $75,000 fine on him. The amount of fine for which Ortland is eligible varies based on his

---

**2.** Under the applicable arson guideline, Newman's loss calculation for his arson was based on the theft guideline, USSG § 2B1.1. *See Newman,* 6 F.3d at 629–30.

Guidelines offense level. *See* USSG § 5E1.2(c)(3) (Nov.1994); USSG § 5E4.2(c)(3) (Nov.1988). We affirm the district court's ruling that Ortland is eligible for the fine.

The presentence report concluded that Gerald did not have the ability to pay a fine based on his current monthly cash flow. Moreover, at sentencing, the court remarked that it planned to impose the maximum fine although the court had "no expectation that he'll pay it." The court stated that, under *United States v. Catherine*, 55 F.3d 1462, 1465 (9th Cir.1995), it could not impose restitution because the value of the partnership when the Ortlands resigned control exceeded the investment by the limited partners. When remarking on *Catherine*, the court commented that even if it could order restitution, "the fact is that he doesn't have any money left or very little money left." Nonetheless, the court made it clear that its refusal to order restitution was based on *Catherine*, and not on a finding that Gerald could not and would never be able to pay restitution. *See generally* 18 U.S.C. § 3572(b) (court should not order fine if will impair ability to pay restitution). The district court then explained that it was imposing "a $75,000 fine, which is the maximum under the Guideline range, ... because I believe that in view of my inability to provide the victims with any restitution, this is the appropriate thing to do."

 Gerald's argument misapprehends the law and his burden of persuasion. First, the defendant has the burden of proving that he cannot pay a fine; in the absence of that proof, the court must impose a fine. USSG § 5E1.2(a) (Nov.1994). Thus, where the record does not show that the defendant cannot pay a fine or that he is "not likely" to be able to pay a fine, and there is evidence supporting the contrary conclusion, the court may impose a fine within the Guideline range. *United States v. Quan–Guerra*, 929 F.2d 1425, 1426–27 (9th Cir.1991). In fact, a court may fine "a presently indigent defendant if it finds that the defendant has sufficient earning capacity to pay the fine in the future." *United States v. Haggard*, 41 F.3d 1320, 1329 (9th Cir.1994).

Secondly, § 5E1.2 of the 1994 Guidelines and § 5E4.2 of the 1988 Guidelines list several factors that a court "shall consider" when determining the amount of the fine, and do not focus solely on ability to pay. The court is directed to consider, among other factors, any pertinent ethical considerations, the need for a combined sentence to reflect the offense seriousness, and any restitution the defendant is obligated to make. *See* USSG § 5E1.2(d) (Nov.1994); USSG § 5E4.2(d) (Nov.1988); *see also* 18 U.S.C. § 3572(a), (b).

 In this case, the court expressed doubt that Gerald would pay a fine or restitution. That is not necessarily a finding that he could not pay a fine, however, and seems to have been a reflection on his willingness to hide his income. *See Quan–Guerra*, 929 F.2d at 1427 (findings need not be express or on the record). Moreover, Gerald did nothing to show that he would not be able to earn a living in the future and to pay a fine from those earnings. He has an excellent background in the securities field and real talent in the real estate development field. *See Haggard*, 41 F.3d at 1329. Three El Sobrante could have been a great success, for example. Additionally, the court expressly considered the fact that it could not order restitution and that equity required the imposition of a fine. *See* USSG § 5E1.2(d) (Nov.1994). In light of Gerald's failure to carry his burden of persuasion that he could not pay a fine in the future and the court's proper consideration of the § 5E1.2 factors, the court's ruling was not clearly erroneous.

## CONCLUSION

Gerald, an expert in financial matters, claims that he did not understand what was required of him when he was convincing investors to put money into the limited partnership which he helped to run. He claims that his former wife, Patricia, was the doyenne of the organization, and paints himself as a mere hard working dupe. The jury agreed with the alternative picture of reality which was painted by the government. A small part of that picture was painted by Gerald's own former lawyer, and, while Gerald is understandably troubled by the fact

that his lawyer's testimony was available, the part painted was of such small importance to the overall case against him that any error was harmless.

However, we do hold that Gerald must be resentenced because he was improperly sentenced on four of the offenses through the use of a version of the Guidelines adopted after he had committed them. The effect of that was to *increase* the punishment for those completed offenses. In other words, it amounted to an ex post facto punishment; even the puissant Sentencing Commission cannot authorize that. Therefore, we vacate that portion of Gerald's sentence and remand for resentencing to correct that error alone.

**AFFIRMED** as to the conviction; **VACATED** and **REMANDED** as to the sentence.

MICHAEL DALY HAWKINS, Circuit Judge, concurring:

Judge Fernandez wisely avoids reaching the issue of waiver of the attorney-client privilege. Because we want clients to be candid with their counsel and we want lawyers to give informed advice, we have long considered their communications beyond the reach of outsiders to the attorney-client relationship. *See, e.g., United States v. Zolin,* 491 U.S. 554, 562, 109 S.Ct. 2619, 2625–26, 105 L.Ed.2d 469 (1989); *Upjohn v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981); *United States v. Chen,* 99 F.3d 1495, 1499–1500 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1429, —— L.Ed.2d —— (1997). This is particularly true in the criminal context, where courts have long frowned on unwarranted government intrusion into these private affairs. *See, e.g., Chen,* 99 F.3d at 1499 ("The attorney-client privilege is essential to preservation of liberty against a powerful government."). It matters not that the content of the communication would be of great interest to the government; creating an exception to the confidential nature of these communications any time the government wanted to "listen in" would swallow up the rule. *Cf. Admiral Ins. Co. v. United States Dist. Ct. for the Dist. of Ariz.,* 881 F.2d 1486, 1492 (9th Cir.1989) ("[T]he advantage of preserving the privilege outweighs the inescapable disadvantage of the resultant secrecy.").

Precisely because the privilege is so critical, it should be deemed waived only in the most express of circumstances. Certainly when the client executes a written waiver of the privilege or asserts at trial as a defense to the charges that he relied on the advice of counsel in doing what he did, our cases are clear that a waiver has occurred and the government may freely explore the details of the discussions. *See Chevron Corp. v. Pennzoil Co.,* 974 F.2d 1156, 1162 (9th Cir.1992) (implied waiver of privilege by assertion of advice-of-counsel defense). But neither of those things occurred here. The government chose not to require a written waiver as a condition of considering the Ortlands' contention that their reliance on counsel negated any possible criminal intent on their part. The government conceded at argument that asking for such a waiver would have been easy enough to do.

We should tread very carefully before approving what the district court sanctioned here. Gerald Ortland did not waive his attorney-client privilege with attorney Ericsson nor did he assert as a defense at trial his reliance on Ericsson's advice. He did attend a pre-indictment conference with representatives of the government and listened while his soon-to-be fugitive wife and their two new lawyers and an accountant argued against seeking an indictment. And while other circuits have held such actions to constitute a waiver of the privilege, the logic and reasoning of those decisions is simply not persuasive.

Having said all that, Judge Fernandez correctly analyzes the record and concludes that any error resulting from the admission of Ericsson's testimony (over the objections of Gerald's trial counsel) was, in light of the entire record, harmless.

I concur.